UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MOJISOLA AFOLABI, ELEANOR KILLI, DAVID ONASILE & OLAYIDE WILLIAMS, <br><br> PLAINTIFFS, <br><br> v. <br><br> LIFESPAN CORPORATION & RHODE ISLAND HOSPITAL, <br><br> DEFENDANTS. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil Action No. 14-191-M |

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56.1, Defendant Rhode Island Hospital ("RIH" or the "Hospital") and Lifespan Corporation ("Lifespan")[1] (collectively, "Defendants"), by and through undersigned counsel, move for summary judgment on Plaintiff David Onasile's ("Onasile" or "Plaintiff") claims.

## INTRODUCTION

Plaintiff was terminated after he hit a co-worker when he angrily attempted to grab some patient menus from her. Both his supervisors saw the scratches on the employee's arm and another co-worker witnessed the incident. Despite this evidence, Plaintiff claimed that nothing ever happened. Based on these facts, RIH terminated Plaintiff's employment. RIH's decision was completely reasonable, especially given that Onasile now admits that he actually may have hit the co-worker. In light of the complete absence of any evidence that suggests the Hospital's actions were related to any improper motive, Plaintiff's claims must be dismissed.

---

[1] Defendant Lifespan Corporation is not a proper party to this litigation because it was not Plaintiff's employer. The only proper defendant in this case is Rhode Island Hospital.

## BACKGROUND FACTS

### I.   PLAINTIFF'S WORK HISTORY.

#### A.   Plaintiff is combative and argumentative with patients and his co-workers.

Plaintiff is Nigerian and Black.  Defendants' Local Rule 56(a) Statement of Undisputed Facts ("SOF") ¶ 1.  The official language of Nigeria is English.  SOF ¶ 2.  While Nigeria's official language is English, many Nigerians also speak a dialect called Yoruba.  SOF ¶ 3.

On December 1, 2003, Plaintiff was hired by RIH to be a Mental Health Worker on Jane Brown South.  SOF ¶ 4.  Plaintiff was a Mental Health Worker from the time he started at RIH through his termination.  SOF ¶ 5.  RIH has three adult psychiatric units:  (1) Jane Brown, 3-South; (2) Jane Brown, 4-South; and (3) Jane Brown, 5-South.  SOF ¶ 6.  Throughout his employment, Plaintiff worked on Jane Brown, 5-South and Jane Brown, 4-South.  SOF ¶ 7.  As a Mental Health Worker, Onasile was responsible for, *inter alia*, (1) participating in the treatment planning process and collaborating with the Professional Nurses to develop the initial problem list and treatment plans for patients, (2) communicating individual treatment plans with other members of the multidisciplinary team, and (3) assisting in the evaluation of care by providing input at team meetings.  SOF ¶ 8.

Throughout his tenure at RIH, Plaintiff displayed a lack of interpersonal skills when interacting with his co-workers and patients.  For example, in Onasile's February 2005 performance evaluation, the following issues were noted:

> Generally, Mr. Onasile is respectful and endorses the team model.  In the area of communication and teamwork, however, I'd like to challenge Mr. Onasile to examine the key elements to being in an effective team-based environment. . . . There have been a number of interpersonal encounters with staff that have required mediation to foster harmony in his working relationships with others.

2

SOF ¶ 9.  Approximately a week after being issued his evaluation, on March 1, 2005, Plaintiff's supervisor, Vania Brownsmall, again discussed with Onasile his approach towards patients.  SOF ¶ 10.  Brownsmall indicated that she discussed "in detail" with Onasile "the benefit of a stand-down position [with patients] who have lost many things in their life."  SOF ¶ 11.  Brownsmall relayed to Onasile that he "is not always aware of how he is perceived[,] but emphasis placed in there being no need to encroach upon a patient's space."  SOF ¶ 12.  Onasile listened and stated that he would remember the advice in the future.  SOF ¶ 13.

Mark Corsi, Assistant Clinical Manager, was also Plaintiff's supervisor for a period of time.  SOF ¶ 14.  On January 26, 2007, Corsi sent Alfredo Haddad, Clinical Manager, an email titled, "I don't have any problems with anyone else," which described several encounters Plaintiff had with his co-workers.  SOF ¶ 15.  Corsi described the following incidents involving Onasile:

- August 2005 – Onasile and Mario Pires got into an argument in front of the secretary's station and Onasile did not like Mr. Corsi's attempt to mediate the dispute and he then went to Vania Brownsmall to complain.

- January 2006 – Onasile got into an argument with an x-ray technician in front of a patient because Onasile refused to wear a mask and gown while transporting the patient.

- January 2006 – Onasile and an evening staff member got in an altercation because Onasile spent too much time in a residents' office.

- July 2006 – Onasile and Lynee Oakhem – "condescending to me" and arguing in front of patients regarding the charge nurse's direction not to drink coffee or eat in the milieu.

- August 2006 – Onasile and Karen Rollini – "disrespectful behavior" by Karen regarding her "unprofessional behavior."  Rollini allegedly called Onasile a jerk when he did not want to write notes on the computer.

- November 2006 – A patient accused Onasile for having solicited her for sex, but when an investigation was attempted the patient said, "I do not like the way he speaks to me."

SOF ¶ 16.   Corsi's email to Haddad concluded by stating that several individuals "expressed their difficulty with providing direction to David, due to his argumentativeness."   SOF ¶ 17.   The individuals told Corsi it was "not worth the effort" because by the time they are "done arguing" with Onasile, they could have performed the job themselves.   SOF ¶ 18.

On February 3, 2011, Corsi sent another email to Haddad about Onasile.   SOF ¶ 19.   The email stated that Plaintiff had his name mentioned "in two different letters from patients regarding his performance."   SOF ¶ 20.   While Corsi informed Haddad that Plaintiff accepted the feedback, he said Onasile "does not acknowledge that his behavior was as described."   SOF ¶ 21. Three months later, on May 9, 2011, an email exchange again noted Plaintiff's inability to communicate without being combative.   SOF ¶ 22.   Joseph Harpool, Registered Nurse, emailed Corsi stating that four patients in a group felt as though Plaintiff was "short, authoritative, and 'bossy' during [the] group, making them feel overpowered and insignificant."   SOF ¶ 23. Harpool sat in on the group to see for himself what was transpiring and witnessed that Plaintiff was "pushing the p[atients] along in group, cutting them short and bossing them around."   SOF ¶ 24.

In June of 2011, Plaintiff was given a performance evaluation by Haddad.   SOF ¶ 25. Again, the performance evaluation criticized Onasile's behavior:

[Mr. Onasile] is courteous with patients and peers, but his abrupt way of speaking and style of professional behavior sometimes gives the recipient the impression of a rigid health care worker, unconcerned with their needs.   Mr. Onasile is very willing to accept feedback from his supervisor, but is distressed by peers who do not address him directly.

SOF ¶ 26.  Plaintiff refused to sign the performance evaluation and, instead, provided a detailed response disagreeing with the criticism in the evaluation.  SOF ¶ 27.  The following year, Haddad issued another performance evaluation to Plaintiff, which noted that "there have been complaints of his being 'short' with the patients and having a demanding approach."  SOF ¶ 28. Again, Onasile attached a written statement to the evaluation disagreeing with the contents.  SOF ¶ 29.

**B.      Plaintiff's combativeness results in Onasile hitting one of his co-workers.**

On February 19, 2013, Joan Salhany became RIH's Director of Psychiatric Nursing. SOF ¶ 30.  As RIH's Director of Psychiatric Nursing, Salhany supervised the Clinical and Assistant Clinical Managers.  SOF ¶ 31.  The staff members reported to the Clinical and Assistant Clinical Managers who, in turn, reported to Salhany.  SOF ¶ 32.  Olukemi Akanji, who is also Black and Nigerian, was an Assistant Clinical Manager and Onasile's direct supervisor. SOF ¶ 33.  Thus, Plaintiff reported to Akanji, who, in turn, reported to Salhany.  SOF ¶ 34.

On June 14, 2013, Onasile was working with a group of patients.  SOF ¶ 35.  According to Onasile, Aliss Collins,[2] a Black and possibly Nigerian Unit Assistant, came into the group and asked Onasile for the patient menus and Onasile said, "Look, I'm busy with it.  I need to finish with this document."  SOF ¶ 36.  Collins sat on the side of Onasile and she grabbed the menus from his hand.  SOF ¶ 38.  The documents Collins grabbed from him were the menus the patients filled out daily.  SOF ¶ 39.  Onasile asserts that when Collins grabbed the menus from his hand he "just calm[ed] down" and "was waiting for [his] boss to come to report it to [his] manager." SOF ¶ 40.  When asked if he ever attempted to grab the menus back from Collins, he replied,

---

[2] Collins' first name is spelled differently throughout various documents, sometimes it is spelled "Elyse" and "Alice."  Collins is now deceased.  SOF ¶ 37.

"No."  SOF ¶ 41.  Collins, on the other hand, claimed she picked up the menus from the table and Onasile scratched her when he tried to snatch them from her.  SOF ¶ 42.

Michelle Domenico, a Registered Nurse on the Unit, witnessed the incident between Onasile and Collins.  SOF ¶ 43.  Contrary to Plaintiff's version of the events, Domenico saw Onasile move towards Collins in a striking-like fashion and then Domenico heard Collins yell "don't hit me."  SOF ¶ 44.  Because Domenico was assigned to the observation board, she was unable to cease this duty and, instead, asked Pauline Giguere, Certified Nursing Assistant, to contact their supervisor, Akanji.  SOF ¶ 45.  Akanji, who had been in a meeting with Salhany, was told to go to the floor because "Aliss and David were fighting."  SOF ¶ 46.  Akanji then talked to Collins and Onasile separately.  SOF ¶ 47.  Collins, who Akanji spoke with first, said that she had begun to pass out the menus when Onasile told her not to and "there was contact between the two of them when David snatched the papers from her."  SOF ¶ 48.  Akanji saw the marks from Onasile on Collins' arm.  SOF ¶ 49.

Akanji then met with Onasile.  SOF ¶ 50.  Onasile admitted to Akanji that he may have made contact with Collins when he snatched the menus from her.  SOF ¶ 51.  Salhany, who was simultaneously interviewing Collins, was told by Collins that she was holding the menus and when Onasile attempted to grab them from her he scratched her.  SOF ¶ 52.  Salhany then called Sandra Badessa, Senior Human Resources Partner, and asked her how she should proceed.  SOF ¶ 53  Badessa told Salhany to send Onasile home pending the investigation and let him know that he should contact his union representative.  SOF ¶ 54.  Salhany then went to the conference room where Akanji and Onasile were speaking and informed Onasile that he was being suspended, pending the investigation, and he should contact his union representative.  SOF ¶ 55.

Three days later, on June 17, 2013, Salhany met with Badessa, Plaintiff and Joseph Iadevaia, Onasile's Union Representative, to discuss the incident.  SOF ¶ 56.  Salhany asked Onasile what happened between him and Collins.  SOF ¶ 57.  Onasile replied that Collins took the menus from him while he was meeting with his group, but nothing else happened.  SOF ¶ 58.  Onasile denied that he ever scratched or hit Collins.  SOF ¶ 59.  Onasile showed Salhany his fingernails and claimed he could not have scratched Collins because he did not have long fingernails.  SOF ¶ 60.  Salhany then ended the meeting and informed Onasile that she would contact him soon.  SOF ¶ 61.

Because Salhany saw the scratches on Collins' arm and all of the witnesses informed her that Onasile had scratched Collins, Salhany believed that Onasile scratched Collins and was lying about the incident.  SOF ¶ 62.  After conferring with Badessa, the decision was made to terminate Onasile for scratching Collins and then claiming that he had not do it.  SOF ¶ 63.  On June 20, 2013, Salhany, Badessa, Onasile and Iadevaia met for a second time.  SOF ¶ 64.  Salhany informed Onasile that he was terminated, effective immediately.  SOF ¶ 65.

On September 20, 2013, an arbitration was held regarding Plaintiff's termination.  SOF ¶ 66.  The Arbitrator started her analysis by stating that "Collins was not shown to have any reason whatsoever to manufacture the story and an injury (however minor the injury) in connection with Mr. Onasile."  SOF ¶ 67.  Second, "both Ms. Akanji and Ms. Salhany testified that they saw the scratches on Ms. Collins' arm."  SOF ¶ 68.  In contrast, Plaintiff testified that "the employees had plotted against him and had conspired to get rid of him[.]"  SOF ¶ 69.  The Arbitrator concluded that Onasile's version of the events, which was that nothing at all happened between him and Collins, was not credible and noted that "Onasile's complete failure to acknowledge even a modicum of responsibility both during the Hospital's investigation and

continuing through arbitration demonstrated such a bleak lack of self-awareness and skewing of reality that it is impossible to label as unreasonable the Hospital's decision to end his employment."  SOF ¶ 70.

     **C.**     **Plaintiff finally admits he may have scratched Collins during his deposition.**

During his deposition, Plaintiff initially testified that he "was falsely accused of hitting somebody, which [he] didn't do that."  SOF ¶ 71.  Instead, Collins "snatched the document[s] from [his] hands," but he said nothing and simply continued with his group.  SOF ¶ 72.  Plaintiff reiterated this point later in his deposition:

> Q.     Okay.  [Collins] certainly couldn't have had any scratches that you caused because you never touched her, correct?
>
> A.     Yes.
>
> Q.     Okay.
>
> A.     I never touch her.  I don't know where she get the scratch.

SOF ¶ 73.  Plaintiff had "no idea" why Collins would accuse him of hitting her, but he was "100 percent" sure that she was lying about everything.  SOF ¶ 74.  Despite denying that he ever touched Collins during the initial investigation, and throughout the grievance process, Onasile acknowledged – for the first time – that he may have accidentally scratched Collins towards the end of his deposition.  Onasile provided the following testimony:

> Q.     Okay.  You think you may have accidentally scratched Ms. Collins, is that what you're saying.
>
> A.     It is possible.  I don't rule it out.  But it's not that I – I know and I scratched her.  When somebody grabs something from your hand unexpectedly, anything can happen.  And my nail is very long, so I – some of my nails, so that might be where she get it.  It's not that I did it intentionally.

SOF ¶ 75.

Onasile was terminated for violating, *inter alia*, the Workplace Violence Policy and the Disruptive Behavior Policy.   SOF ¶ 76.   The Workplace Violence Policy states that all employees are prohibited from "[p]hysically touching another person in an intimidating, malicious, or sexually harassing manner[.]"   SOF ¶ 77.   Likewise, the Disruptive Behavior Policy precludes employees from engaging in "[i]nappropriate physical contact with another individual or contact that is threatening or intimidating[.]"   SOF ¶ 78.   Each of the policies includes discipline "up to and including termination of employment."   SOF ¶ 79.

## II.   PLAINTIFF'S SUPERVISOR (WHO IS BLACK AND NIGERIAN) ASKS THE EMPLOYEES ON HER UNIT TO SPEAK ENGLISH ON THE FLOOR.

### A.   Akanji e-mails her unit and requests that the employees refrain from speaking other languages while on the unit and around other staff.

On November 13, 2012, Theresa Carrier, a floating Certified Nursing Assistant, sent an email to Christina Gomes, Manager of the Float Staff, titled, "Question about staff talking another language on the job."   SOF ¶ 80.   The prior day, Carrier worked on Jane Brown, 3-South, and she claimed that "all the staff were talking in African language."   SOF ¶ 81.   Carrier's email stated that the staff made her feel "very uncomfortable."   SOF ¶ 82.   When Carrier complained to another CNA about everyone speaking a different language, a Registered Nurse told her, "[t]oo bad" and they kept speaking their language.   SOF ¶ 83.   The email was forwarded to Akanji because she was responsible for managing the floor at the time.   SOF ¶ 84.   A meeting was subsequently held with all managers and Ellen Lebeuf, Director of Nursing, asked Akanji to address the issue.   SOF ¶ 85.

On November 21, 2012, approximately a week after Carrier's complaint, Akanji sent out an email to the entire unit titled, "Use of Other Languages."   SOF ¶ 86.   Akanji's email contained the following:

> During our meeting today 11/21/12, a discussion was raised about the use of a 2nd language on the floor.  Please be cognizant of using other languages on the unit and around other staff, this may be perceived as been [*sic*] rude or disrespective [*sic*].  Thank you for your cooperation in regards to this matter.

SOF ¶ 87.  While Lebeuf asked Akanji to address the issue, she did not tell Akanji what to write.

SOF ¶ 88.  The only time Plaintiff was told he needed to speak English at work was in Akanji's

email.  SOF ¶ 89.  However, Onasile did not speak Nigerian in front of patients "[b]ecause it's a

medical unit" and "[t]hey don't understand it[.]"  SOF ¶ 90.  When Akanji sent the email out,

Salhany was not working at RIH and she did not "have anything to do with it."  SOF ¶ 91.

### B.      Plaintiff and others complain about the alleged "language" policy.

Onasile recalls going to one or two meetings at which the issue of speaking a language

other than English was discussed.  SOF ¶ 92.  At some point (the exact date is unclear), Plaintiff

and a group of employees met with Iadevaia to discuss the language issue.  SOF ¶ 93.  They all

agreed to speak with Lebeuf about the issue.  SOF ¶ 94.  The group eventually wrote a letter to

Lebeuf complaining about not being able to speak Yoruba (often referred to as Nigerian).  SOF

¶ 94.  Onasile cannot recall if he personally attended the meetings with Iadevaia and Charlie

Imonah, Union Steward.  SOF ¶ 95.  Besides writing this letter, Onasile only discussed the

language issue with his colleagues.  SOF ¶ 96.

On April 1, 2013, approximately one month after Salhany started working at RIH,

Salhany was informed by Lebeuf that Iadevaia and Imonah wanted to meet in Lebeuf's office to

discuss several complaints from the staff on Jane Brown, 4-South.  SOF ¶ 97.  That same day, a

meeting was held between Salhany, Lebeuf, Iadevaia and Imonah.  SOF ¶ 98.  During the

meeting, several issues were discussed, including the staff being required to speak English on the

floor.  SOF ¶ 99.  While Imonah stated that several staff members complained about being

required to speak English at the nurses' station, he never identified the staff members who made the complaint.  SOF ¶ 100.

On April 19, 2013, Salhany addressed the language issue during a staff meeting.  SOF ¶ 101.  Salhany informed the staff they needed to speak English in the clinical areas, including at the nurses' station when speaking with patients, unless they were talking to patients who spoke a different language.  SOF ¶ 102.  Onasile did not say anything during or after the meeting to Salhany about the language issue. SOF ¶ 103.

### C.    Plaintiff makes a series of complaints *after* he is terminated.

Two separate letters were submitted to the Director of Diversity, Gertrude Jones.  SOF ¶ 104.  The letters sent to Jones were titled, "Discriminatory Practices in the Psychiatry Department at Rhode Island Hospital."  SOF ¶ 105.  The first letter was an unsigned copy and was delivered before July 31, 2013, while the signed copy was delivered on July 31, 2013.  SOF ¶ 106.  Onasile did not sign the letter and had been terminated when the letter was written.  SOF ¶ 107.  Onasile did not have anything to do with the letter.  SOF ¶ 108.  Salhany never saw any of the letters written by the employees regarding any complaints until the commencement of the litigation.  SOF ¶ 109.  Onasile never made any complaints to Salhany about being discriminated against while he was employed at RIH.  SOF ¶ 110.

Plaintiff allegedly met with an individual named "Steven" from the National Association for the Advancement of Colored People ("NAACP").  SOF ¶ 111.  However, Plaintiff is not sure whether he met with Steven, or anyone else from the NAACP, before or after he left RIH.  SOF ¶ 112.  On July 27, 2013, Onasile wrote an email to Jim Vincent, former President of the Providence Branch of the NAACP, titled, "Discriminatory practice at Rhode Island Hospital."  SOF ¶ 113.  This email was sent to Vincent after Onasile's termination.  SOF ¶ 114.  While

Onasile identified Helene Macedo, President of UNAP, and "Norman," Vice President of UNAP, in his Answers to Interrogatories as individuals he complained to about the language issue, during his deposition he could not recall if he ever actually complained to them.  SOF ¶ 115.

## ARGUMENT

### I.      STANDARD OF REVIEW.

Rule 56 of the Federal Rules of Civil Procedure governs the process of summary judgment.  Summary judgment is appropriate when (1) the moving party demonstrates the absence of any genuine issue of material fact and (2) the non-moving party fails to demonstrate that a trier of fact could reasonably resolve that issue in a non-movant's favor.  *Borges v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010).  In an employment discrimination case, "[t]he plaintiff must do more than cast doubt on the wisdom of the employer's justification; to defeat summary judgment, the plaintiff must introduce evidence that the real reason for the employer's action was discrimination."  *Villanueva v. Wellesley Coll.*, 930 F.2d 124, 127-28 (1st Cir. 1991).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no **genuine** issue of **material** fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

### II.     THE COURT SHOULD NOT ACT AS A SUPER-PERSONNEL DEPARTMENT WHEN REVIEWING WHETHER RIH'S DECISION TO TERMINATE ONASILE WAS APPROPRIATE.

The First Circuit has repeatedly stated that courts should not intervene in the business judgments of employers unless the decision was based on discrimination.  *See Webber v. Int'l Paper*, 417 F.3d 229, 238 (1st Cir. 2005) ("an employer is free to terminate an employee for any nondiscriminatory reason even if its business judgment seems objectively unwise").  RIH was

12

confronted with conflicting versions of the incident of June 14, 2013.  On one hand, Collins, who was also Black and possibly Nigerian, claimed she had been hit by Plaintiff.  SOF ¶ 42.  In contrast, Plaintiff contended that he never touched her and nothing of significance ever happened.  SOF ¶ 73.  Witnesses, however, corroborated Collins' account of what transpired. Domenico heard Collins yell "don't hit me," and both Akanji and Salhany saw the scratches on Collins' arm.  SOF ¶¶ 44 and 68.  Based on this, Salhany concluded that Onasile had scratched Collins and then lied by denying that anything happened.  SOF ¶ 63.  RIH's decision to terminate Onasile, even if it was incorrect, does not make it unlawful.  In the absence of any discriminatory conduct by RIH, Plaintiff cannot ask this Court to sit as a "super personnel department" and undo his termination.  *Melendez v. Autogermana*, 622 F.3d 46, 53 (1st Cir. 2010).  *See also Bucci v. Hurd Buick Pontiac GMC Truck, LLC*, 85 A.3d 1160, 1174 (R.I. 2014) ("we also echo the cautions described in *Mesnick v. General Electric. Co.*, 950 F.2d 816, 825 (1st Cir. 1991), that '[c]ourts may not sit as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions.").  There is absolutely no evidence that discrimination played any role in RIH's decision to terminate Plaintiff and, therefore, the Court should not disturb the employment decision.

## III.    PLAINTIFF'S DISCRIMINATION CLAIMS MUST BE DISMISSED UNDER THE *MCDONNELL DOUGLAS* BURDEN SHIFTING PARADIGM.

Count I (disparate treatment under Title VII), Count II (disparate treatment under FEPA) and Count III (disparate treatment under the RICRA) are all analyzed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden shifting framework.  *See Horn v. S. Union Co.*, No. 04-434S, 2008 WL 2466696, at *7 fn. 5 (D.R.I. June 18, 2008) ("Case law developed under Title VII . . . is 'routinely applied' to claims brought pursuant to FEPA and RICRA.")

(internal citations omitted).   The *McDonnell Douglas* burden-shifting framework provides that if a plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendant to "offer a legitimate, nondiscriminatory reason for the adverse employment action" and "[t]he third step requires the employee to convince the fact-finder that the legitimate, nondiscriminatory reason was pretext for unlawful discriminatory animus." *Id.* at *8.

A.   **Plaintiff cannot establish a *prima facie* case of discrimination because he did not perform his job at a level that rules out the possibility that he was terminated for inadequate job performance.**

To establish a *prima facie*[3] case of discrimination, Plaintiff must show, *inter alia*, that he was "performing h[is] job at a level that rules out the possibility that []he was fired for inadequate job performance."   *Smith v. Status Computer, Inc.*, 40 F.3d 11, 15 (1st Cir. 1994). Plaintiff cannot meet this standard.   Plaintiff was terminated because he hit Collins during an argument and then denied that the incident ever occurred.   Surely, Plaintiff's hitting a co-worker requires the Court to reach the conclusion that he was not "performing h[is] job at a level that rules out the possibility that []he was fired for inadequate job performance."   *Id.*

B.   **RIH terminated Plaintiff for a legitimate, non-discriminatory reason; namely, hitting a co-worker during an argument.**

Assuming, *arguendo*, Plaintiff can establish a *prima facie* case, RIH has met its burden to proffer "a legitimate, non-discriminatory reason" for Onasile's discharge by establishing that he violated multiple RIH policies.   *See Champagne v. Servistar Corp.*, 138 F.3d 7, 12 (1st Cir. 1998) (defendant articulated a legitimate, non-discriminatory reason for terminating the plaintiff where it produced evidence he falsified log books, in violation of a company policy).   Here, the

---

[3] To establish a *prima facie* case of disparate treatment, a plaintiff must show "(1) []he is a member of a protected class; (2) []he was performing h[is] job at a level that rules out the possibility that []he was fired for inadequate job performance; (3) []he suffered an adverse job action by h[is] employer; and (4) the employer sought a replacement for h[im] with roughly equivalent qualifications."   *DeCamp v. Dollar Tree Stores, Inc.*, 875 A.2d 13, 21 (R.I. 2005) (quoting *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir. 1994)).

14

Hospital's proffered reason for Plaintiff's termination – hitting a co-worker – satisfies the "legitimate, non-discriminatory reason" prong of the *McDonnell Douglas* analysis.   RIH's policies prohibit physically touching a co-worker in an aggressive or threatening manner.   *See, e.g.,* SOF ¶¶ 77 and 78 (workplace violence and disruptive behavior policies both state that inappropriate contact with a co-worker is forbidden and can result in termination).   Indeed, courts from within Rhode Island and other jurisdictions have held that terminating an employee for violating a company policy against violence in the workplace is a legitimate, non-discriminatory reason.   *See, e.g., Hajian-Bahmany v. Women & Infant's Hosp. of R.I.*, No. 10-120-M, 2011 WL 3424642, at *3 (D.R.I. Aug. 4, 2011) ("The Hospital has articulated a legitimate, nondiscriminatory reason for terminating [the plaintiff] – that she violated the Hospital's workforce violence policy by making unwanted physical contact with a co-worker."); *Blackshear v. Interstate Brands Corp.*, No. 2:09-cv-06, 2010 U.S. Dist. LEXIS 50355, at *18 (S.D. Ohio May 21, 2010) (terminating an employee for violating the employer's workplace violence policy is a legitimate non-discriminatory reason).   It is ***beyond*** dispute that Plaintiff hitting a co-worker is a legitimate, non-discriminatory reason for terminating his employment.

> **C.**     **Plaintiff's denial of striking Collins is insufficient to satisfy the pretext requirement because Salhany reasonably believed the reports from Akanji, Collins and Domenico, and Salhany saw the scratches with her own eyes.**

Once a defendant establishes a legitimate, non-discriminatory reason for terminating an employee, the plaintiff can only survive summary judgment if he can "convince the fact-finder that the legitimate, nondiscriminatory reason was pretext for unlawful discriminatory animus." *DeCamp*, 875 A.2d at 21-22.   It is beside the point whether Akanji, Collins and Domenico fabricated the incident.   The question here is whether RIH ***believed*** its stated reason for its employment decision.   *See Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31-32 (1st Cir. 2007) ("In the absence of some other proof that the decisionmaker harbored a discriminatory animus, it is not enough that [the employer's] perception may have been incorrect.   Rather, the plaintiff

must show that the decisionmaker did not believe in the accuracy of the reason given.")
(alterations in original and citations omitted).   Said differently, "the issue is not whether [the
employer's] reasons . . . were real, but merely whether the decisionmakers . . . believed them to
be real." *Mulero-Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 674 (1st Cir. 1996) (citation omitted).
The overwhelming evidence demonstrates that RIH reasonably believed that Onasile hit Collins
during their argument on June 14, 2013.   Domenico, an unbiased third-party, witnessed the
incident; she saw Onasile swing his arm at Collins and then Collins yelled "don't hit me."   SOF
¶ 44.   Akanji, who is also Black and Nigerian, admitted that she saw the scratches on Collins'
arm immediately after the incident.   SOF ¶¶ 33 and 68.

In fact, Onasile's own deposition testimony underscores the reasonability of RIH's
decision to terminate him.   Throughout the investigation and grievance process, Onasile was
adamant that he never touched Collins.   SOF ¶ 75.   However, during his deposition, he admitted
that he may have hit Collins:

> Q.   Okay.   You think you may have accidentally scratched Ms. Collins, is that
> what you're saying.
>
> A.   It is possible.   I don't rule it out.   But it's not that I – I know and I
> scratched her.   When somebody grabs something from your hand
> unexpectedly, anything can happen.   And my nail is very long, so I – some
> of my nails, so that might be where she get it.   It's not that I did it
> intentionally.

SOF ¶ 75.   The fact that Plaintiff ultimately admitted to the conduct for which he was terminated,
after years of denying it, further illustrates that the Hospital's decision to terminate him was
reasonable.

Furthermore, the Court is permitted to utilize the arbitration decision as evidence in its
pretext analysis.   *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974) ("The arbitral
decision may be admitted as evidence and accorded such weight as the court deems

appropriate."); *Udo v. Tomes*, 54 F.3d 9, 10 n.4 (1st. Cir. 1995) (an arbitrator's decision can be used by a court to determine pretext).[4]  After noting that Collins had no reason to lie about the incident and both Salhany and Akanji saw the scratches on Collins' arm, the Arbitrator ruled in RIH's favor and upheld the termination.  SOF ¶ 68.  In upholding RIH's decision, the Arbitrator concluded "Onasile's complete failure to acknowledge even a modicum of responsibility both during the Hospital's investigation and continuing through arbitration demonstrated such a bleak lack of self-awareness and skewing of reality that it is impossible to label as unreasonable the Hospital's decision to end his employment."  SOF ¶ 70.  Like the Arbitrator, this Court should conclude that RIH's decision to terminate Onasile's employment was lawful and appropriate.

---

[4]In *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974), the U.S. Supreme Court held that "[t]he arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate."  *See also Perry v. Larson*, 794 F.2d 279, 284 (7th Cir. 1986) (whether to admit an Arbitrator's Opinion and Award in an employment discrimination case is within the discretion of the district court).  In *Udo v. Tomes*, 54 F.3d 9, 13 (1st Cir. 1995), the First Circuit affirmed summary judgment in favor of a hospital regarding a physician's layoff that was challenged as age and race discrimination.  As part of the *McDonnell Douglas* burden-shifting analysis, the plaintiff asserted pretext, in part, based on an underlying arbitration decision, which concluded that the physician's layoff violated the collective bargaining agreement.  *Id.* at 11.  At the arbitration, even though the plaintiff alleged discrimination, the arbitrator ruled based on the collective bargaining agreement and "did not consider Udo's discrimination claims." *Id.* at 11.  Citing *Gardner-Denver Co.,* the First Circuit concluded that the arbitration decision, while not binding, "could be considered some evidence of pretext."  *Id.* at 13 n.4.  Nevertheless, the First Circuit ruled in favor of the employer because the plaintiff had failed to show that the articulated reason for his layoff "was [a] pretext *for discrimination.*"  *Id.* at 13 (emphasis in original) (citing *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 16 (1st Cir. 1994) ("Title VII does not grant relief to a plaintiff who has been discharged unfairly, even by the most irrational of managers, unless the facts and circumstances indicate that discriminatory *animus* was the reason for the decision")).

IV.   **PLAINTIFF CANNOT ESTABLISH THAT HE WAS RETALIATED AGAINST FOR ENGAGING IN PROTECTED ACTIVITY.**

  A. **Plaintiff has failed to establish that he engaged in protected activity prior to his termination.**[5]

    1. <u>Salhany was unaware that Onasile had made any complaints about the language issue.</u>

Plaintiff alleges that prior to his termination he and others had conversations with various union representatives around November 2012 (or seven months prior to his termination) and they also sent a letter to Lebeuf regarding being required to speak English on the unit.  SOF ¶¶ 94.  It is axiomatic that a retaliation claim cannot lie where the alleged decision-makers were unaware of the protected activity.  *See Sellers v. U.S. DOD*, 654 F. Supp. 2d 61, 110 (D.R.I. 2009) (employee cannot establish a causal connection between protected activity and adverse action where the decision-maker was unaware of protected activity); *Sanchez v. Denver Pub. Sch.*, 164 F.3d 527, 534 (10th Cir. 1998) (same).  While Salhany eventually became aware of the language issue after she was hired, the issue pre-existed her employment at RIH.  SOF ¶¶ 97 and 109.  More significantly, Salhany was completely unaware that Onasile was one of the individuals involved in the language issue.  SOF ¶¶ 103 and 109.  Accordingly, Plaintiff's termination could not have been in retaliation for the alleged complaints because the decision-maker lacked any knowledge that Onasile was one of the individuals who complained.

---

[5] To prevail on his retaliation claim, Plaintiff must prove RIH retaliated against him because he engaged in protected activity.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) (holding a plaintiff in a retaliation case must prove that "his or her protected activity was a but-for cause of the alleged adverse action by the employer."); *Ponte v. Steelcase, Inc.*, 741 F.3d 310, 321 (1st Cir. 2014).  The *prima facie* elements of a retaliation claim require that the plaintiff (1) engage in protected conduct, (2) suffer an adverse action, and (3) establish a causal connection between the protected activity and the adverse employment action.  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 827 (1st Cir. 1991).

2.     The alleged protected activity that occurred after Onasile was terminated does not afford him any protection.

Plaintiff's July 27, 2013 email to the NAACP and the letters which were given to the Director of Diversity, Gertrude Jones, towards the end of July 2013 both occurred after Onasile was terminated on June 14, 2013. SOF ¶¶ 107. Because Plaintiff's termination preceded the protected activity, no claim for retaliation can lie with respect to these alleged complaints. *See New Eng. Health Care Emples. Union v. R.I. Legal Servs.*, 273 F.3d 425, 429 (1st Cir. 2001) ("appellant cannot make its prima facie case that the employee suffered an adverse employment action in retaliation for engaging in a protected activity because she was terminated before she filed her discrimination claims."); *Pearson v. Mass. Bay Transp. Auth.*, No. 08-11733-NMG, 2012 U.S. Dist. LEXIS 31101, at **57-58 (D. Mass. Feb. 3, 2012) ("[A]n adverse employment action that predates an employer's knowledge that an employee engaged in protected activity cannot lead to an inference that the adverse action was motivated by retaliation.").

3.     The alleged complaints made by Onasile's co-workers do not constitute protected activity for which Plaintiff can rely on to prove his retaliation claim.

Plaintiff's Answers to Interrogatories allege that he complained to multiple individuals, but when questioned during his deposition he could not recall making these complaints. SOF ¶ 115. The mere fact that other employees may have complained about certain conduct they believed to be discriminatory is inconsequential to Plaintiff's argument that ***he*** engaged in any protected activity. Plaintiff cannot rely on alleged complaints made by his co-workers to satisfy the protected activity prong of his *prima facie* case. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175 (2011) (third-party reprisals to "a close family member" could constitute retaliation, but "inflicting a milder reprisal on a mere acquaintance will almost never do so"). To

19

the extent that any of Plaintiff's co-workers may have complained about the ability to speak a language other than English at work (or anything else), Onasile cannot rely on these complaints to prevail on his retaliation claim.

**B.      Plaintiff is unable to make out a *prima facie* case for retaliation because an intervening event – his scratching a co-worker – broke the causal link to any protected activity.**

Assuming, *arguendo*, that Plaintiff can demonstrate that he engaged in protected activity and that the protected activity occurred prior to his termination, any causal chain that could be formed between the alleged protected activity and his termination was severed when RIH received a report that Plaintiff hit Collins on June 14, 2013.  Such a break in the causal chain negates the causation necessary for a retaliation claim.  *See, e.g., Weiler v. R&T Mech., Inc.*, 255 Fed. Appx. 665, 668 (3d Cir. 2007) (finding that the plaintiff's job abandonment was a "crucial intervening fact [that] broke the causal chain" between the protected conduct and plaintiff's termination); *Hankins v. AirTran Airways, Inc.*, 237 Fed. Appx. 513, 520-21 (11th Cir. 2007) (finding no causal link between the protected activity and plaintiff's termination where she committed an intervening act of misconduct which "broke the causal chain"); *Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998) (finding no causal connection because "it is simply impossible to miss the significant intervening events between these two dates," including plaintiff's insubordination and false written statement to her employer); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997) (finding no causal connection where the discharge followed a "significant and costly error"); *Furtado v. Std. Parking Corp.*, 820 F. Supp. 2d 261, 273 (D. Mass. 2011) (The "dispute is ultimately immaterial, however, because the undisputed intervening acts of misconduct sever the causal connection (if any) between the protected conduct and the adverse employment decision.") (citations omitted).  The sequence of

events – Plaintiff being immediately suspended and terminated only six days after hitting Collins – leads to only one conclusion: he was terminated for hitting Collins.

## V.   PLAINTIFF CANNOT PREVAIL ON HIS RHODE ISLAND WHISTLEBLOWER PROTECTION ACT CLAIM FOR THE SAME REASONS HE CANNOT SUCCEEED ON HIS RETALIATION CLAIM.

The Rhode Island Whistleblowers Protection Act ("RIWPA") prohibits an employer from terminating or otherwise discriminating against an employee because the employee reports or is about to report a violation which the employee knows or reasonably believes has occurred, or is about to occur, of a federal or state law, rule or regulation to a public body or the employee's supervisor.   R.I. Gen. Laws § 28-50-3.   Although the Rhode Island Supreme Court has not expressly addressed the causation test applicable to RIWPA claims, courts analyzing such claims, as well as those brought pursuant to similar statutes from other jurisdictions, have employed the framework established by the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Barboza v. Town of Tiverton*, No. 07-339-ML, 2010 WL 2231995, at *7 (D.R.I. June 2, 2010); *Babbitt v. PRI XVII, L.P.*, No. 07-274 S, 2009 WL 3450959, at *6 (D.R.I. Oct. 26, 2009); *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (evaluating claim under Maine Whistleblower Protection Act); *Woodford v. CVS Pharm., Inc.*, 905 F. Supp. 2d 418, 420 (D.R.I. 2012) (analyzing claim under Florida's whistleblower statute).   Because the analysis for a RIWPA claim mirrors that of a retaliation claim under Title VII, FEPA and the RICRA, Plaintiff's RIWPA claim should be dismissed for the same reasons stated *supra* in Section IV.

## VI.   NEGLIGENT TRAINING AND NEGLIGENT SUPERVISION[6]

Plaintiff's negligent training and supervision claim is misplaced because an employee is not permitted to bring such a claim against his own employer.   As discussed below, Plaintiff's negligent training and supervision claim should be dismissed for the following reasons: (1) only a third-party (as opposed to an employer's employee) is permitted to assert such a claim; (2) Rhode Island's Workers' Compensation Exclusivity Provision precludes an employee from asserting such negligence claims against his employer; (3) the claim is preempted by Rhode Island and federal employment laws; and (4) Plaintiff cannot establish the elements of the claim, even if the Court allowed him to pursue the claim.

> **A.    The policy reasons underlying the creation of a negligent training and supervision claim expressly reject the notion that employees are permitted to sue their employers under this theory.**

When the Rhode Island Supreme Court adopted the principles of negligent training and negligent supervision, it unequivocally limited an employer's liability to third parties:

> [W]e align ourselves with the majority of jurisdictions that recognize the direct liability of an employer to ***third parties*** who are injured by acts of unfit, incompetent, or unsuitable employees.

*Welsh Mfg. v. Pinkerton's Inc.*, 474 A.2d 436, 438 (R.I. 1984) (emphasis added).   "Indeed, an action for negligent hiring provides a remedy to injured ***third parties*** who would otherwise be foreclosed from recovery under the master-servant doctrine since the wrongful acts of employees in these cases are likely to be outside the scope of employment or not in furtherance of the master's business."   *Id.* at 439 (emphasis added).

---

[6] The torts of "negligent training" and "negligent supervision" are separate causes of action.   *See Welsh Mfg. v. Pinkerton's, Inc.,* 474 A.2d 436, 442-443 (R.I. 1984).   For the purpose of this motion, Defendants believe both claims fail for the same reasons.

While Rhode Island courts have not directly addressed the issue of whether an employee is a third-party relative to its employer, two decisions from the Rhode Island Supreme Court indicate that it would conclude that employees are not considered third-parties vis-à-vis their employers. *See Boucher v. McGovern*, 639 A.2d 1369, 1374 (R.I. 1994) (declining to allow an employee to seek contribution from a co-worker as a joint tortfeasor because Rhode Island law "deems a master and a servant or a principal and an agent to be a single tortfeasor"); *Nunes v. Aiello*, 664 A.2d 1121, 1121-22 (R.I. 1995) (refusing to allow an employee to circumvent the workers' compensation laws to sue co-workers because plaintiff's theory of "dual liability" was "without merit").

Unlike injured third-parties who would be unable to recover against RIH, Plaintiff has the ability to recover under a myriad of statutes; namely, those under which he has asserted claims in the Complaint: Title VII, the RICRA and FEPA.  SOF ¶ 116.  *Contra Welsh Mfg.*, 474 A.2d at 439 (negligent hiring provides a remedy for injured third-parties that would be prohibited from recovering from the employer because the wrongful acts were outside the scope of employment). The Rhode Island General Assembly and Congress have provided Plaintiff with multiple statutory grounds to pursue his discrimination claims, which makes the asserted claim of negligent training and negligent supervision superfluous.

**B.     Plaintiff's negligent training and supervision claim is barred by Rhode Island's Workers' Compensation exclusivity provision.**

Rhode Island's Workers' Compensation Act ("RIWCA") provides the sole avenue of redress for employees who have suffered harm in the workplace.  *See, e.g., Nassa v. Hook-SupeRx, Inc.*, 790 A.2d 368, 373-74 (R.I. 2002) (the RIWCA is the exclusive remedy for claims against employers by employees for intentional infliction of emotional distress).  In order to

accomplish this goal, the Rhode Island General Assembly included an exclusivity provision within the RIWCA, thereby barring an employee from recovery when he is entitled to recovery under the RIWCA.  *See* R.I.G.L. § 28-29-20.  "[T]he exclusivity clause is 'intended to preclude any common-law action against an employer, substituting a statutory remedy at the election of the employee when he enters employment.'"  *Folan v. State of R.I./DCYF*, 723 A.2d 287, 290 (R.I. 1999) (quoting *Hornsby v. Southland Corp.*, 487 A.2d 1069, 1072 (R.I. 1985)).  *See also Nunes*, 664 A.2d at 1121-22 ("By virtue of [the exclusivity provision] an injured employee may not maintain a common law action against an employer for his or her injuries.")

The singular Rhode Island case addressing the viability of an employee's negligent training and negligent supervision claim against its employer held that the employee's claims were barred by the RIWCA's exclusivity provision.  *See DaPonte v. Ocean State Job Lot, Inc.*, No. WC-02-0646, 2009 R.I. Super. LEXIS 28, at *5-6 (R.I. Super. Ct. Mar. 4, 2009), *aff'd*, 21 A.3d 248 (R.I. 2011) (summary judgment granted on plaintiff's negligent hiring and supervision claim where defendant argued that the claims were barred by the workers' compensation exclusivity provision).  Numerous other courts have similarly held that an employee may not pursue such a claim because of the workers' compensation laws.  *See, e.g., Pickett v. Colonel of Specrfish*, 209 F. Supp. 2d 999, 1004-05 (D.S.D. 2001) (claims of negligent supervision are "just one more industrial mishap in the factory, of the sort [the employer] has the right to consider exclusively covered by the compensation system" and therefore fall "under the auspices of the Workers' Compensation statutes"); *Beaulieu v. Northrop Grumman Corp.*, 161 F. Supp. 2d 1135, 1148 (D. Haw. 2000) (negligent supervision and retention claims are work injuries arising from the conditions of plaintiff's employment and, therefore, barred by the workers' compensation exclusivity provision); *Silvestre v. Bell Atl. Corp.*, 973 F. Supp. 475, 486 (D.N.J.

1997) ("An employee cannot, however, assert negligent training and supervision against an employer.  Under New Jersey law an action in negligence against an employer is barred by the New Jersey Workers Compensation Act."); *Irvin Investors, Inc. v. Sup. Ct.*, 800 P.2d 979, 982 (Ariz. Ct. App. 1990) (workers' compensation statute barred plaintiff's claims of negligent hiring, supervision and retention); *Downer v. Detroit Receiving Hosp.*, 477 N.W.2d 146, 148 (Mich. Ct. App. 1991) ("we find that plaintiff's [negligent hiring] claim is barred by the exclusive remedy provision of the Workers' Disability Compensation Act."); *Fields v. Cummins Emps. Fed. Credit Union*, 540 N.E.2d 631, 636 (Ind. Ct. App. 1989) (the plaintiff's "claim for negligent retention was premised on [her employer's] negligence in the employment relationship . . . such claims are barred by the exclusivity provision of the Worker's Compensation Act.").

Plaintiff claims that RIH was negligent in training and supervising its agents, supervisors, and managers.  SOF ¶ 117.  Plaintiff's claims clearly arise out of and directly deal with his employment.  The RIWCA provides the exclusive remedy for work-related personal injuries, like the ones alleged by Plaintiff.  *See Nassa*, 790 A.2d at 372.  Accordingly, Plaintiff's negligent training and supervision claim should be dismissed because it is bared by the RIWCA's exclusivity provision.

### C.   Plaintiff's negligent training and supervision claim is preempted by the comprehensive anti-discrimination statutory schemes designed to protect employees.

Title VII and FEPA include comprehensive remedial statutory schemes that completely comprehend and envelop common law claims for discrimination and retaliation, and therefore, preempt Plaintiff's negligent training and supervision claims.  *See Taite v. Peake,* No. 08-cv-258-SM, 2009 U.S. Dist. LEXIS 2006, at *10 (D.N.H. Jan. 12, 2009) ("[T]he preemptive effect of Title VII . . . precludes plaintiff from proving her common-law claims with evidence of

conduct, such as racial discrimination, that is prohibited by Title VII."); *Noel v. AT&T Corp.*, No. 4:12-cv-1673 CAS, 2013 U.S. Dist. Lexis 43628, at *16 (E.D. Mo. Mar. 27, 2013) (the Missouri Human Rights Act's statutory remedial scheme preempts any exceptions to the at-will doctrine related to race, color, gender, etc.). *See also Brown v. GSA*, 425 U.S. 820, 835 (1976) (Title VII "provides the ***exclusive*** judicial remedy for claims of discrimination in federal employment.") (emphasis added).   If the Court were to allow Plaintiff to proceed on his negligent training and supervision claim based on alleged discriminatory conduct, it would enable employees to side-step the administrative process (and deadlines).   The Court would, therefore, unintentionally create a rather large exception to the administrative process designed to govern discrimination claims.   Many of the courts that have addressed the issue have refused to allow employees to pursue such claims due to this concern.   *See, e.g., Williams v. Thompson Corp.*, No. 00-2256(MJD/SRN), 2001 U.S. Dist. LEXIS 19041, at **6-7 (D. Minn. Aug. 13, 2003) (negligent supervision and retention claims preempted by MHRA, because such claims were based on alleged knowledge that employees committed discriminatory acts against plaintiff); *Cannizzaro v. Neiman Marcus, Inc.*, 979 F. Supp. 465, 478-79 (N.D. Tex. 1997) (claims of negligent retention and supervision of sales manager who allegedly engaged in age discrimination was preempted by the TCHRA); *Wise v. Digital Equip. Corp.*, No. C9-94-461, 1994 Minn. App. LEXIS 1181, at *5 (Minn. Ct. App. Nov. 29, 1994), *aff'd*, 1995 Minn. LEXIS 77 (Minn. Jan. 25, 1995) ("Wise's negligence claims are not parallel with her sexual harassment claim, but rather are identical, and we agree with the trial court that they are preempted by MHRA.").   Plaintiff's negligent training and supervision claim is simply an employment discrimination claim masquerading as a negligence claim.

### D. Plaintiff has failed to establish the elements of negligent training and supervision.

Assuming, *arguendo*, that Onasile's negligent training and supervision claim is not limited to third-parties, barred by the RIWCA's exclusivity provision or preempted by state or federal employment discrimination laws, Plaintiff is ***still*** unable to establish the requisite elements of the claim. In order to establish a claim for negligent training or supervision, a plaintiff must show that the employer failed "to exercise reasonable care in [training or supervising] a person who the employer knew or should have known was unfit or incompetent for the employment, thereby exposing third parties to an unreasonable risk of harm." *Welsh Mfg.*, 474 A.2d at 440. Plaintiff has failed to produce a single fact from which the Court could conclude that the Hospital failed to exercise reasonable care in training or supervising Salhany or any other employees.

## VII. RIH'S ALLEGED "POLICY" REQUIRING EMPLOYEES TO SPEAK ENGLISH IN CLINICAL AREAS DOES NOT VIOLATE THE LAW.

### A. Policies that require bi-lingual employees to speak English at work do not constitute national origin discrimination.[7]

Where, as here, an employee is bi-lingual, a rule requiring that the employee speak one of the languages he is fluent in does not violate the law. *See, e.g., Garcia v. Gloor*, 618 F.2d 264,

---

[7] While it does not appear that the Court of Appeals for the First Circuit has addressed the issue, it is far from clear that it would equate issues related to a person's language with national origin discrimination. *See, e.g., Garcia v. Gloor*, 618 F.2d 264, 269 (5th Cir. 1980) (the EEO Act does not support an interpretation that equates the language an employee prefers to use with his national origin); *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983) ("Language, by itself, does not identify members of a suspect class."); *Napreljac v. John Q. Hammons Hotels, Inc.*, 461 F. Supp. 2d 981, 1029-30 (S.D. Iowa 2006) ("Language and national origin are not interchangeable."); *Brewster v. City of Poughkeepsie*, 447 F. Supp. 2d 342, 351 (S.D.N.Y. 2006) ("[Title VII] does not protect against discrimination on the basis of language."); *Long v. First Union Corp.*, 894 F. Supp. 933, 941 (E.D. Va. 1995) ("nothing in Title VII . . . provides that an employee has a right to speak his or her native tongue while on the job"), *aff'd*, 86 F.3d 1151 (4th Cir. 1996); *see also Smothers v. Benitez*, 806 F. Supp. 299, 306 (D.P.R. 1992) ("While language can be considered a mutable characteristic, it has immutable aspects. New languages can be learned and old ones forgotten; however, the knowledge of a language, insofar as it is an ethnic characteristic, leaves identifiable traces like accents, surnames, and behavior patterns.").

272 (5th Cir. 1980) ("[A]n employer's rule forbidding a bilingual employee to speak anything but English in public areas while on the job is not discrimination based on national origin as applied to a person who is fully capable of speaking English and chooses not to do so in deliberate disregard of his employer's rule."); *Olivarez v. Centura Health Corp.*, 203 F. Supp. 2d 1218, 1221-25 (D. Colo. 2002) (English-only policies as applied to bilingual employees do not, alone, violate Title VII); *Kania v. Archd. of Phil.*, 14 F. Supp. 2d 730, 733 (E.D. Pa. 1998) ("courts have agreed that – particularly as applied to multi-lingual employees – an English-only rule does not have a disparate impact on the basis of national origin, and does not violate Title VII.") (surveying cases).

In *Cosme v. Salvation Army*, 284 F. Supp. 2d 229, 239 (D. Mass. 2003), which appears to be the only decision within the First Circuit that has addressed whether English-only laws as applied to bi-lingual employees provides a basis for recovery under anti-discrimination laws, the U.S. District Court for the District of Massachusetts held that "an English Language Policy does not, in and of itself, constitute discrimination or disparate treatment for bilingual employees." *Id.* at 239 (citations omitted).

It is undisputed that Plaintiff – who took his deposition in English and worked with a population at RIH that was predominately English speaking – spoke English fluently. Indeed, as Plaintiff acknowledges, the official language of Nigeria is English. SOF ¶ 2. Thus, RIH's alleged policy requiring individuals, including Plaintiff, to speak English in certain areas at work when such individuals are fully capable of speaking the language is not discrimination based on national origin. *See Garcia*, 618 F.2d at 272.

**B.    RIH's alleged policy that employees speak English in clinical areas does not violate the EEOC guidelines.**[8]

RIH's alleged policy that its employees speak English in clinical areas does not violate even the broadest interpretation of a national origin claim, which is encompassed in the EEOC guidelines.   The EEOC guidelines provide that "an employer may have a rule requiring that employees speak only in English at *certain times* where the employer can show that the rule is justified by business necessity." 29 C.F.R § 1606.7(b) (emphasis added).   Courts have routinely found that "certain times" English-only rules are permissible "when they are justified by a need to stem hostility between bilingual employees speaking a foreign language and employees who do not speak that language, as well as when English-speaking supervisors need to understand what is being said in a work area." *EEOC v. Sephora USA*, 419 F. Supp. 2d 408, 415 (S.D.N.Y. 2005) (surveying cases); *Barber v. Lovelace Sandia Health Sys.*, 409 F. Supp. 2d 1313, 1328 (D.N.M. 2005) ("There is nothing inherently discriminatory about English-only policies established for legitimate business reasons.   The EEOC has determined that a rule requiring employees to speak only English, when applied at all times, is presumed to violate Title VII and a English-only rule when applied only sometimes is permissible if based on business justification.") (internal citations omitted); *Roman v. Cornell Univ.*, 53 F. Supp. 2d 223, 237 (N.D.N.Y. 1999) ("All decisions of which this Court is aware have held that English-only rules

---

[8] For the purposes of this motion, Defendants do not dispute the validity of the EEOC's guidance on this issue. However, the Court is not bound by the EEOC's regulations. *See Cosme v. Salvation Army*, 284 F. Supp. 2d 229, 240 (D. Mass. 2003) ("While the EEOC regulations may offer guidance to the Court, the Court is not bound by them."). *See also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) ("As an administrative interpretation of the Act by the enforcing agency, these Guidelines, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts . . . *may* properly resort for guidance.") (emphasis added, internal quotations and citations omitted); *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1489 (9th Cir. 1993) (invalidating EEOC guideline that allowed employee to establish a *prima facie* disparate impact case by merely proving existence of English-only policy; nothing in plain language of Title VII supported the guideline, and guideline contravened Supreme Court precedent by presuming, without requiring proof, that the policy had a disparate impact).   Accordingly, Defendants reserve the right to dispute the validity of this regulation at a later time.

are not discriminatory as applied to bilingual employees where there is a legitimate business justification for implementing such a rule" and "[s]everal courts have held that an English-only policy designed to reduce intra-office tensions is a legitimate business reason."); *Smothers v. Benitez*, 806 F. Supp. 299, 308 (D.P.R. 1992) ("While a blanket English-only rule is considered by the EEOC to be a per se violation of Title VII, a limited English-only rule may be justified by business necessity."); *Gonzalez v. Salvation Army*, No. 89-1679–CIV–T-17, 1991 U.S. Dist. LEXIS 21692, at *7-8 (M.D. Fla. June 3, 1991) ("The enforcement of an English-only rule on an employer's premises under circumstances where co-employees who are working or customers who visit the employer's establishment for business purposes can overhear conversations is not a violation of Title VII . . . as applied to a person . . . who has the ability to speak English."), *aff'd*, 985 F.2d 578 (11th Cir. 1992), *cert. denied*, 508 U.S. 910 (1993); *Tran v. Standard Motor Prods., Inc.*, 10 F. Supp. 2d 1199, 1210 (D. Kan. 1998) (business necessity includes insuring that all workers can understand each other, preventing injuries, and preventing co-workers from feeling they are being talked about).

The only "English-only" policy Plaintiff has identified is Akanji's November 21, 2012 email, which stated as follows:

> During our meeting today 11/21/12, a discussion was raised about the use of a 2nd language on the floor. Please be cognizant of using other languages on the unit and around other staff, this may be perceived as been [*sic*] rude or disrespective [*sic*]. Thank you for your cooperation in regards to this matter.

SOF ¶ 87. As made clear by the above language, Akanji – who is also Black and Nigerian – only requested that employees be cognizant of using other languages "on the unit and around other staff." Thus, even assuming this email constitutes an "English-only policy," it is limited to certain times. Plaintiff himself acknowledged the legitimate business justification for not

speaking Nigerian in front of patients: "[b]ecause it's a medical unit" and "[t]hey don't understand it[.]"  SOF ¶ 90.  Furthermore, as courts have made clear, ensuring that all workers understand each other and that no one feels that they are being talked about is a business necessity that constitutes a legitimate justification for the policy.  *See Tran*, 10 F. Supp. 2d at 1210.  Therefore, RIH's "policy" requesting that employees speak English in clinical areas (after receiving a complaint from a staff member about the issue) does not amount to discrimination.

## CONCLUSION

RIH terminated Plaintiff because a co-worker claimed he scratched her when he angrily attempted to grab patient menus from her.  Akanji and Salhany both saw the scratches on Collins' arm.  Domenico saw Onasile swing at Collins and then Collins yell "don't hit me."  Despite this evidence, Plaintiff denied anything ever happened.  Presented with this scenario, RIH decided to terminate Plaintiff's employment.  RIH's decision was completely reasonable, especially given that Onasile now admits that he actually may have hit Collins.  In light of the complete absence of any evidence which even *arguably* suggests Defendants' actions were related to any improper motive, Plaintiff's claims must be dismissed.

RHODE ISLAND HOSPITAL and
LIFESPNAN CORPORATION,

By their attorneys,


/s/ Eric B. Mack
John D. Doran (#6415)
Eric B. Mack (#7784)
LITTLER MENDELSON, P.C.
One Financial Plaza, Suite 2205
Providence, RI  02903
T: 401.824.2500
F: 401.454.2969
jdoran@littler.com
emack@littler.com

Dated: October 31, 2017

## **CERTIFICATE OF SERVICE**

I, Eric B. Mack, certify that a true and accurate copy of the foregoing was filed and
served electronically by operation of the Court's CM/ECF System upon all counsel of record on
this 31st day of October, 2017.

/s/ Eric B. Mack
Eric B. Mack

Firmwide:143013631.11 057807.1078

32