UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MOJISOLA AFOLABI, ELEANOR KILLI, DAVID ONASILE, OLAYIDE WILLIAMS, & OLUKEMI AKANJI )<br><br>PLAINTIFFS, )<br><br>v. )<br><br>LIFESPAN CORPORATION & RHODE ISLAND HOSPITAL, )<br><br>DEFENDANTS. ) | Civil Action No. 14-191-M<br><br>Civil Action No. 14-320-M |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AGAINST
PLAINTIFFS' MOJISOLA AFOLABI AND ELEANOR KILLI**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56.1, Defendant Rhode Island Hospital ("RIH" or the "Hospital") and Lifespan Corporation ("Lifespan")[1] (collectively, "Defendants"), by and through undersigned counsel, move for summary judgment on Plaintiffs Mojisola Afolabi ("Afolabi") and Eleanor Killi ("Killi") (collectively, "Plaintiffs") claims.

## INTRODUCTION

This case is straightforward: following an incident involving a patient on July 31, 2013, a number of Plaintiffs' co-workers informed management that Afolabi and Killi did not check in on the patient in five minute intervals, as required; falsified the chart in order to indicate that they routinely checked in on the patient; did not respond in a timely, urgent manner in response to an emergency code; and ultimately, failed to provide the requisite care to the patient. Despite this evidence, Plaintiffs maintained that they checked in on the patient as required, and did not falsify the chart. Based on these facts, RIH terminated Plaintiffs' employment. RIH's decision was

---

[1] Defendant Lifespan Corporation is not a proper party to this litigation because it was not Plaintiffs' employer. The only proper defendant in this case is Rhode Island Hospital.

completely reasonable, especially given that several employees, including Plaintiffs, acknowledged that failing to provide adequate patient care and falsifying the chart can result in termination. Plaintiffs' claims must, therefore, be dismissed.

## BACKGROUND FACTS

### I. SUMMARY OF PLAINTIFFS' EMPLOYMENT AT RIH.

Plaintiffs are Black and of foreign descent. Plaintiff Afolabi is Nigerian and Plaintiff Killi is from Cameroon. Defendants' Local Rule 56(a) Statement of Undisputed Facts ("SOF") ¶ 1. The official language of Cameroon and Nigeria is English. SOF ¶ 2.[2] While Nigeria's official language is English, many Nigerians speak a dialect called Yoruba. SOF ¶ 3. Furthermore, although Cameroon's official languages are English and French, many Cameroonian's speak a dialect of English known as Pidgin. SOF ¶ 4. Plaintiffs speak English without issue. SOF ¶ 5.

Plaintiffs were employees of the Hospital between the years of 2006 and 2013. Afolabi started working for the Hospital in June 2006. SOF ¶ 7.[3] Killi began working for the Hospital in 2006.[4] SOF ¶ 13.

---

[2] "This [C]ourt may take judicial notice of adjudicative facts at any time if the fact 'is not subject to reasonable dispute' either because it is 'generally known within the trial court's territorial jurisdiction,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Seguin v. Suttell*, No. 13-CV-095-JNL-LM, 2013 WL 5523703, at *1 (D.R.I. Oct. 3, 2013) (citing Fed. R. Evid. 201(b). The Federal Government, whose accuracy cannot reasonably be questioned, has clearly stated that English is the official language of Nigeria. See Central Intelligence Agency, *The World Fact Book: Nigeria*, available at https://www.cia.gov/library/publications/the-world-factbook/geos/ni.html (last visited Aug. 15, 2017). As a result, this Court may take judicial notice that English is the official language of Nigeria. *See, e.g., id.* (taking judicial notice "that the United States Census Bureau has reported a statistic for the percentage of the population over age 5 living in households in Providence, Rhode Island, where a language other than English is spoken at home"); *see also Hapai v. Brown*, 21 Haw. 499 (1913) (taking judicial notice that Hawaiian is the official language).

[3] Afolabi was hired as a Nursing Student Associate and Adult Patient Services. SOF ¶ 8. In June 2007, Afolabi was transferred to a Professional Nurse 1 position. SOF ¶ 9. In July of that year, after she passed her boards, Afolabi was promoted to a Registered Nurse position and was stationed on James Brown 2 North. SOF ¶ 10. Some point thereafter, at her request, the Hospital transferred Afolabi to James Brown 5 South. SOF ¶ 11. In October 2010, Afolabi was transferred to James Brown 4 South. SOF ¶ 12.

During July of 2013, Plaintiffs were employed as Registered Nurses ("RNs") for RIH working on a locked, adult psychiatric unit.[5]  During this period of time, Joan Salhany ("Salhany") was Plaintiffs' Director and Olukemi Akanji ("Akanji"), who was also Black and Nigerian, was their Assistant Clinical Manager.  SOF ¶ 16.  The patients for whom Plaintiffs were responsible suffer from severe mental illness and must be constantly monitored.  SOF ¶ 17.  As RNs, Plaintiffs were responsible for—among other things—checking on their patients in five, fifteen, or thirty minute intervals.  SOF ¶ 18.  In performing these rounds, Plaintiffs were required to observe and make notations of the patient's status and wellbeing.  SOF ¶ 19.  The ultimate goal in performing these rounds is to ensure "patient safety."  SOF ¶ 20.  Failure to do so could result in serious disciplinary consequences.  SOF ¶ 21.

## II.     ON JULY 31, 2013, PLAINTIFFS' FAIL TO ROUTINELY CHECK ON THEIR PATIENT AND FALSIFY THE BOARD.

On July 31, 2013, Plaintiffs were working the overnight shift on the Jane Brown South Building, 4th Floor ("JBS4").  SOF ¶ 22.  During their shift, Plaintiffs were required to check their patients regularly, in five, fifteen, or thirty minute increments, and then take notes on the "board" regarding what they observed during that routine check-in.  SOF ¶ 23.  Pursuant to Hospital policy, failure to do so can result in termination.  SOF ¶ 24.  The only other individuals stationed on the floor that night were Kayla Morra ("Morra"), Clinical Nursing Assistant; Olayide Williams, RN ("Williams"); and Maria Lugo ("Lugo"), Security Guard.  SOF ¶ 26.

---

[4] Killi was first employed as a Nursing Student Associate in 2006, and was employed full time in December 2010 as a RN.  SOF ¶ 14.

[5] RIH has three adult psychiatric units:  (1) Jane Brown 3-South; (2) Jane Brown 4-South; and (3) Jane Brown 5-South.  SOF ¶ 15.

Lugo, who understands Spanish, was on Constant Observation Duty[6] and was watching a patient in the Seclusion Room. SOF ¶ 27. Lugo was stationed at this position from 11:45 p.m. on July 30, 2013, until the following morning. SOF ¶ 28. Lugo's position in the Seclusion Room allowed her to keep constant observation on her patient, while simultaneously having a clear view of what was occurring in the Hospital's hallway and the doorway of the adjacent patient room. SOF ¶ 29.

As early as 4:00 a.m. on July 31, 2013, Lugo observed another patient, who was assigned to the adjacent room, in pain. SOF ¶ 30. The patient in question was supposed to be checked on by Plaintiffs every five minutes. SOF ¶ 31. Lugo observed the patient come out of his room and, while holding hold his chest, complain that he was having pains in his chest. SOF ¶ 32. The patient was complaining for "a while," was asking for help, and wanted the nurse. SOF ¶ 33. Because Lugo was on constant observation, she could not leave her station to get a nurse to assist the patient. SOF ¶ 34.

Lugo's observations of the patient being in pain went on for *a while* until Timothy Masse ("Masse"), the other Security Guard on duty that night, arrived at JBS4 to bring Lugo a spare battery for her walkie-talkie. SOF ¶ 35. Masse similarly observed the patient crouched over in pain and holding his chest. SOF ¶ 36. Around the time of Masse's arrival, the patient began speaking Spanish to Masse and Lugo. SOF ¶ 37. Afolabi, who showed up while Lugo and Masse were speaking, asked Lugo if she could translate what the patient was trying to tell her. SOF ¶ 38. Lugo repeated to Afolabi that the patient was not feeling well and was complaining about chest pains. SOF ¶ 39. In the middle of Lugo translating the patient's complaints to Afolabi, she told Lugo that the patient already received his medication and walked

---

[6] There are certain patients who pose such a safety risk to themselves that checking on them at regular intervals is not sufficient. These patients are provided constant observation which is as it sounds, someone literally watches the patient at all times to ensure they do not harm themselves. SOF ¶ 25.

away.  SOF ¶ 40.  Lugo did not recall seeing Afolabi, or anyone else—including Killi—for "a really long time," *at least* forty-five minutes, after that.  SOF ¶ 41.

Sometime thereafter, Morra went to check the patient's vital signs.  SOF ¶ 42.  As soon as she put the blood pressure cuff on the patient's arm, he began to have a seizure and fall to the ground.  SOF ¶ 43.  Morra broke the patient's fall and yelled for help.  SOF ¶ 44.

Finally, after some time, Afolabi and Killi arrived to the patient's room.  SOF ¶ 45.  Killi, who realized the patient's blood sugar was low, left the patient's room (with her colleague, Williams) to obtain orange juice.  SOF ¶ 46.  Afolabi, not knowing how to respond to the situation, called a doctor in the Adult Emergency Department, who told her to call the Rapid Response Team ("RRT") for help.  SOF ¶ 47.  Afolabi then yelled to LeeAnn McMahon ("McMahon"), Unit Secretary, to "call a code," but Afolabi did not specify what type of code to call.  SOF ¶ 48.  McMahon then called a Code Blue.  SOF ¶ 49.

Plaintiffs, who were the only JBS4 nurses on duty,[7] did not retrieve the "code cart" – a set of trays/drawers on wheels used for transportation and dispensing of emergency medication/equipment at the site of an emergency – after calling the Code Blue, as they should have so that it would be ready when the Code Team arrived.  SOF ¶ 50.

Nearby managers and nurses—consisting of Joanne Jannitto ("Jannitto"), Clinical Manager of JBN4; Jack Beauchamp ("Beauchamp"), RN; and Patricia Avila ("Avila"), Assistant Clinical Manager—immediately responded to the code.  SOF ¶ 51.  Plaintiffs were not in the patient's room at the time they arrived.  SOF ¶ 52.

Avila and Jannitto immediately began assessing the patient.  SOF ¶ 53.  Avila's assessment quickly revealed that the patient was having a seizure.  SOF ¶ 54.  Killi then returned

---

[7] Plaintiffs were accompanied by another RN, Williams, who was the Charge Nurse that night.  SOF ¶ 50.

to the patient's room and attempted to give the actively seizing patient orange juice, which could have caused him to choke.  SOF ¶ 55.

Because Plaintiffs failed to retrieve the code cart, Jannitto and Morra had to leave the patient's room and get the code cart themselves.  SOF ¶ 56.  When Beauchamp arrived in response to the Code Blue, Afolabi did not know how to override the Omni Cell machine (a machine which secures and dispenses medication and drugs), so they could obtain the medication needed to stop the patient's seizures.  SOF ¶ 57.  Because Afolabi (and Williams, the charge nurse) were unable to do it, Beauchamp overrode the Omni Cell machine and retrieved the needed medication himself.  SOF ¶ 58.  Due to the arrival of the Code Team members and the IV nurse, Avila and Jannitto left.  SOF ¶ 59.

On the board used to ensure patients are checked by nursing staff regularly, in five, fifteen or thirty minute increments, Afolabi and Killi recorded they performed the relevant checks on the patient.  SOF ¶ 60.  However, Lugo, who observed the entire incident, confirmed that the nurses did not routinely check on the patient that night and were not in the area for at least 45 minutes prior to the patient's seizures and, therefore, could not have performed the checks as recorded.  SOF ¶ 61.

That very morning, Salhany, Psychiatry Department Director, received numerous reports regarding Plaintiffs' conduct.  SOF ¶ 62.  Salhany and the Hospital's Human Resource Department investigated the reports by interviewing over a dozen employees, including Plaintiffs.  SOF ¶ 63.  Lugo specifically told Salhany that she did not see Plaintiffs on the night in question, and Masse corroborated Lugo's account.  SOF ¶ 64.  Other witnesses informed Salhany that "there were no nurses in the vicinity of caring for the patient who was at issue" on that night.  SOF ¶ 65.  In addition, it was clear from the observations of all present third-parties

that once the patient began having a seizure, Plaintiffs did not respond in a timely, urgent manner, and did not possess basic nursing skills. SOF ¶ 66.

During the investigation neither Afolabi nor Killi took ownership of the errors of care or their 45 minute absence. SOF ¶ 67. Furthermore, from what Lugo observed, Plaintiffs lied about their rounds and falsified the board. SOF ¶ 68. Ultimately, Plaintiffs were terminated for failing to appropriately care for their patient, falsifying the boards, and lying about the falsification. SOF ¶ 70. Salhany made the decision to terminate Plaintiffs in conjunction with Sandra Badessa ("Badessa"), Senior Human Resources Representative. SOF ¶ 71. Plaintiffs were terminated in August 2013. Plaintiffs are represented by a union, but chose not to challenge their terminations as lacking in just cause pursuant to the collective bargaining agreement.

## III. PLAINTIFFS' SUPERVISOR (WHO IS BLACK AND NIGERIAN) ASKS THE EMPLOYEES ON HER UNIT TO SPEAK ENGLISH ON THE FLOOR.

### A. Akanji e-mails her unit and requests that employees refrain from speaking other languages while on the unit and around other staff.

On November 13, 2012, Theresa Carrier, a floating Certified Nursing Assistant, sent an email to Christina Gomes, Manager of the Float Staff, titled, "Question about staff talking another language on the job." SOF ¶ 72. The prior day, Carrier worked on Jane Brown, 3-South. SOF ¶ 73. When Carrier complained to another CNA about everyone speaking a different language, a Registered Nurse told her "[t]oo bad" and they kept speaking their language. SOF ¶ 74. The email was forwarded to Akanji because she was responsible for managing the floor at the time. SOF ¶ 75. A meeting was held that afternoon with all managers, wherein Ellen Lebeuf ("Lebeuf"), Director of Nursing, asked Akanji to address the issue. SOF ¶ 76.

Approximately a week later, on November 21, 2012, Akanji sent out an email to the entire unit titled, "Use of Other Languages." SOF ¶ 77. Akanji's email contained the following:

> During our meeting today 11/21/12, a discussion was raised about the use of a 2nd language on the floor. Please be cognizant of using other languages on the unit and around other staff, this may be perceived as been [*sic*] rude or disrespectful [*sic*]. Thank you for your cooperation in regards to this matter.

SOF ¶ 78. While Lebeuf asked Akanji to address the issue, she did not tell Akanji what to write. SOF ¶ 79. The only time Plaintiffs were told that they needed to speak English at work was in Akanji's email. SOF ¶ 80.

### B. Plaintiffs and others complain about the alleged "language" policy.

Plaintiffs recall going to a meeting at which the issue of speaking a language other than English was discussed. SOF ¶ 81. At some point (the exact date is unclear), Plaintiffs and a group of other people met with Joe Iadevaia ("Iadevaia"), the Union Representative for United Nurses and Allied Professionals ("UNAP"), and discussed the language issue. SOF ¶ 82. They all agreed to speak with Lebeuf about the issue. SOF ¶ 83. The group eventually wrote a letter to Lebeuf complaining about not being able to speak Yoruba (often referred to as Nigerian). SOF ¶ 84. Besides writing this letter, Plaintiffs only discussed the language issue with their colleagues. SOF ¶ 85.

In April 2013, approximately one month after Salhany started working at RIH, Ellen Lebeuf and Salhany received a call from Iadevaia, saying he wanted to meet with her. SOF ¶ 86. That same day, a meeting was held between Salhany, Lebeuf, Iadevaia and Charlie Iamona, the Union Steward for the 4th Floor. SOF ¶ 87. During the meeting, several issues were discussed, including the staff being required to speak English. SOF ¶ 88.

Salhany addressed the issue during a staff meeting, and informed the staff they needed to speak English in the clinical areas, including at the nurses' station when speaking with patients,

unless they were talking to patients who spoke a different language.  SOF ¶ 89.  The staff was permitted to speak other languages while on break or off the unit.  SOF ¶ 90.  At that meeting, Beth Calderone asked about people speaking other languages on the floor.  SOF ¶ 91.  Afolabi stood up and asked if there was a policy on the issue and Salhany replied there was a policy. SOF ¶ 92.

When Akanji sent the email out in November 2012, Salhany was not working at RIH and she did not "have anything to do with it."  SOF ¶ 93.  Salhany never saw any of the letters written by the employees regarding any complaints until the commencement of this litigation. SOF ¶ 94.  Salhany never told Plaintiffs that they could not speak a language other than English at work.  SOF ¶ 95.  Plaintiffs were never written up for speaking a language other than English at work.  SOF ¶ 96.  In fact, Plaintiffs were never disciplined in any way at all for speaking a language other than English at work.  SOF ¶ 97.

## ARGUMENT

### I.    STANDARD OF REVIEW.

Rule 56 of the Federal Rules of Civil Procedure governs the process of summary judgment.  Summary judgment is appropriate when (1) the moving party demonstrates the absence of any genuine issue of material fact and (2) the non-moving party fails to demonstrate that a trier of fact could reasonably resolve that issue in a non-movant's favor.  *Borges v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010).  In an employment discrimination case, "[t]he plaintiff must do more than cast doubt on the wisdom of the employer's justification; to defeat summary judgment, the plaintiff must introduce evidence that the real reason for the employer's action was discrimination."  *Villanueva v. Wellesley Coll.*, 930 F.2d 124, 127-28 (1st Cir. 1991). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

## II. THE COURT SHOULD NOT ACT AS A SUPER-PERSONNEL DEPARTMENT WHEN REVIEWING WHETHER RIH'S DECISION TO TERMINATE PLAINTIFFS WAS APPROPRIATE.

The First Circuit has repeatedly stated that courts should not intervene in the business judgments of employers unless the decision was based on discrimination. *See Webber v. Int'l Paper*, 417 F.3d 229, 238 (1st Cir. 2005) ("an employer is free to terminate an employee for any nondiscriminatory reason even if its business judgment seems objectively unwise"). RIH was confronted with conflicting versions of the incident on July 31, 2013. On the one hand, several witnesses, including Lugo who was on constant observation and had a direct view of the patient and his room, informed Salhany that they did not see Plaintiffs in the vicinity of caring for the patient on the night in question. SOF ¶ 64. On the other hand, on the board used to ensure patients are checked by nursing staff regularly, Plaintiffs recorded that they performed the relevant checks on the patient. SOF ¶ 60. When questioned, Plaintiffs maintained that they did not falsify the board. SOF ¶ 68. Based on this, Salhany and Badessa concluded that Plaintiffs falsified the board, and then lied about the falsification. SOF ¶ 69. RIH's decision to terminate Plaintiffs, even if it was incorrect, does not make it unlawful. In the absence of any discriminatory conduct by RIH, Plaintiffs cannot ask this Court to sit as a "super personnel department" and undo their termination. *Melendez v. Autogermana*, 622 F.3d 46, 53 (1st Cir. 2010); *see also Bucci v. Hurd Buick Pontiac GMC Truck, LLC*, 85 A.3d 1160, 1174 (R.I. 2014) ("we also echo the cautions described in *Mesnick v. General Electric. Co.*, 950 F.2d 816, 825 (1st Cir. 1991), that '[c]ourts may not sit as super personnel departments, assessing the merits –

or even the rationality – of employers' nondiscriminatory business decisions."). There is absolutely no evidence that discrimination played any role in RIH's decision to terminate Plaintiffs and, therefore, the Court should not disturb the employment decision.

## II. PLAINTIFFS' DISCRIMINATION CLAIMS MUST BE DISMISSED UNDER THE *MCDONNELL DOUGLAS* BURDEN SHIFTING PARADIGM.

Count I (disparate treatment under Title VII), Count II (disparate treatment under FEPA) and Count III (disparate treatment under the RICRA) are all analyzed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden shifting framework. *See Horn v. S. Union Co.*, No. 04-434S, 2008 WL 2466696, at *7 fn. 5 (D.R.I. June 18, 2008) ("Case law developed under Title VII . . . is 'routinely applied' to claims brought pursuant to FEPA and RICRA.") (internal citations omitted). The *McDonnell Douglas* burden-shifting framework provides that if a plaintiff establishes a *prima facie* case of discrimination, the burden then shifts to the defendant to "offer a legitimate, nondiscriminatory reason for the adverse employment action" and "[t]he third step requires the employee to convince the fact-finder that the legitimate, nondiscriminatory reason was pretext for unlawful discriminatory animus." *Id.* at *8.

### A. Plaintiffs cannot establish a *prima facie* case of discrimination because they did not perform their job at a level that rules out the possibility that they were terminated for inadequate job performance.

To establish a *prima facie*[8] case of discrimination, Plaintiffs must show, *inter alia*, that they were "performing [their] job at a level that rules out the possibility that [they were] fired for inadequate job performance." *Smith v. Status Computer, Inc.*, 40 F.3d 11, 15 (1st Cir. 1994). Plaintiffs cannot meet this standard. Plaintiffs were terminated for failing to routinely check in

---

[8] To establish a *prima facie* case of disparate treatment, a plaintiff must show "(1) []he is a member of a protected class; (2) []he was performing h[is] job at a level that rules out the possibility that []he was fired for inadequate job performance; (3) []he suffered an adverse job action by h[is] employer; and (4) the employer sought a replacement for h[im] with roughly equivalent qualifications." *DeCamp v. Dollar Tree Stores, Inc.*, 875 A.2d 13, 21 (R.I. 2005) (quoting *Smith v. Stratus Computer, Inc.*, 40 F.3d 11, 15 (1st Cir. 1994)).

on a patient, falsifying the board, and lying about the falsification. Surely, failing to properly care for a patient by routinely checking in on the patient—the job for which they were hired—and then lying about doing so requires the Court to reach the conclusion that Plaintiffs were not "performing [their] job at a level that rules out the possibility that [they were] fired for inadequate job performance." *Id*.

**B.    RIH terminated Plaintiffs for a legitimate, non-discriminatory reason; namely, failing to care for a patient, falsifying the board, and lying about the falsification.**

Assuming, *arguendo*, Plaintiffs can establish a *prima facie* case, RIH has met its burden to proffer "a legitimate, non-discriminatory reason" for Plaintiffs' discharge by establishing that they violated multiple RIH policies. *See Champagne v. Servistar Corp.*, 138 F.3d 7, 12 (1st Cir. 1998) (defendant articulated a legitimate, non-discriminatory reason for terminating the plaintiff where it produced evidence he falsified log books, in violation of a company policy). Here, the Hospital's proffered reason for Plaintiffs' termination – failing to care for a patient, falsifying the board, and lying about the falsification – satisfies the "legitimate, non-discriminatory reason" prong of the *McDonnell Douglas* analysis. Indeed, courts have held that terminating healthcare personnel for failing to provide adequate patient care is a legitimate, non-discriminatory reason. *See, e.g., Griel v. Franklin Med. Ctr.*, 71 F. Supp. 2d 1, 25 (D. Mass. 1999) ("Concern about patient safety might well justify an employer's decision to terminate a health care provider."); *Runyon v. MIT*, 871 F. Supp. 1502, 1509 (D. Mass. 1994) (consideration of patient care is a legitimate, non-discriminatory reason for a reduction in force); *see also Immormino v. Lake Hosp. Sys., Inc.*, 127 F. Supp. 3d 829, 837 (N.D. Ohio 2015) (holding that terminating the plaintiff nurses for the falsification of patient charts was a legitimate, non-discriminatory reason); *Taunton v. Noland Health Servs., Inc.*, 908 F. Supp. 2d 1245, 1256 (N.D. Ala. 2012) (finding that terminating plaintiff for failing to reassess a patient when she should have done so was a legitimate, non-retaliatory reason for termination). It is beyond dispute that Plaintiffs'

failure to care for a patient is a legitimate, non-discriminatory reason for terminating their employment.

**C.**   **Plaintiffs' denial of falsifying the board on July 31, 2013 is insufficient to satisfy the pretext requirement because RIH reasonably believed the observations of all present third-parties.**

Once a defendant establishes a legitimate, non-discriminatory reason for terminating an employee, the plaintiff can only survive summary judgment if he can "convince the fact-finder that the legitimate, nondiscriminatory reason was pretext for unlawful discriminatory animus." *DeCamp*, 875 A.2d at 21-22.   While Defendants dispute that Lugo, Masse, Jannitto, Beauchamp, and Avila all fabricated what occurred on July 31, 2013, that is not the point.   The question here is whether RIH *believed* its stated reason for its employment decision.   *See Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31-32 (1st Cir. 2007) ("In the absence of some other proof that the decisionmaker harbored a discriminatory animus, it is not enough that [the employer's] perception may have been incorrect.   Rather, the plaintiff must show that the decisionmaker did not believe in the accuracy of the reason given.") (alterations in original and citations omitted). Said differently, "the issue is not whether [the employer's] reasons . . . were real, but merely whether the decisionmakers . . . believed them to be real." *Mulero-Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 674 (1st Cir. 1996) (citation omitted).

The overwhelming evidence demonstrates that RIH reasonably believed that Plaintiffs failed to properly care for a patient on July 31st, falsified the board, and lied about the falsification.   Plaintiffs were required to check on the patient in five minute intervals.   SOF ¶ 31. On the board used to ensure patients are checked by nursing staff, Afolabi and Killi recorded they performed the relevant checks on the patient.   SOF ¶ 60.   Lugo, who was on constant observation of a nearby patient room and was therefore able to observe the patient the entire

night, told Salhany that she did not see Plaintiffs caring for the patient on the night in question, other than at one point in time.  SOF ¶ 64.  Even still, after Lugo finally saw Afolabi, and alerted her to the fact that the patient was complaining of chest pains, Afolabi inexplicably left the area without checking on the patient and then neither Afolabi nor Killi were in the area for *at least* 45 minutes after that and prior to the patient's seizures.  SOF ¶ 41.  The accounts provided by Masse, and other witnesses, corroborated Lugo's story and informed Salhany that Plaintiffs' did not respond in a timely, urgent manner.  SOF ¶¶ 64, 66.  Plaintiffs, who acknowledged that failing to routinely check in on patients could result in serious disciplinary action, were the only individuals who claimed they routinely checked in on the patient that night.  SOF ¶¶ 21, 24.  The fact that several witnesses testified that Plaintiffs' failed to provide adequate patient care, falsified the board, and lied about the falsification—the conduct for which they were terminated—illustrates that the Hospital's decision to terminate Plaintiffs was reasonable.

## IV.   PLAINTIFFS CANNOT ESTABLISH THAT THEY WERE RETALIATED AGAINST FOR ENGAGING IN PROTECTED ACTIVITY.[9]

### A.   Plaintiffs are unable to make out a *prima facie* case for retaliation because an intervening event – failing to care for a patient – broke the causal link to any protected activity.

Assuming, *arguendo*, that Plaintiffs can demonstrate that they engaged in protected activity and that the protected activity occurred prior to their termination, any causal chain that could be formed between the alleged protected activity and their termination was severed when RIH was notified of Plaintiffs' failure to care for the patient on July 31, 2013.  Such a break in the causal chain negates the causation necessary for a retaliation claim.  *See, e.g., Weiler v. R&T Mech., Inc.*, 255 Fed. Appx. 665, 668 (3d Cir. 2007) (finding that the plaintiff's job abandonment was a "crucial intervening fact [that] broke the causal chain" between the protected conduct and

_____

[9] For purposes of this summary judgment motion only, RIH will not dispute that Plaintiffs engaged in protected activity.

plaintiff's termination); *Hankins v. AirTran Airways, Inc.*, 237 Fed. Appx. 513, 520-21 (11th Cir. 2007) (finding no causal link between the protected activity and plaintiff's termination where she committed an intervening act of misconduct which "broke the causal chain"); *Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998) (finding no causal connection because "it is simply impossible to miss the significant intervening events between these two dates," including plaintiff's insubordination and false written statement to her employer); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997) (finding no causal connection where the discharge followed a "significant and costly error"); *Furtado v. Std. Parking Corp.*, 820 F. Supp. 2d 261, 273 (D. Mass. 2011) (The "dispute is ultimately immaterial, however, because the undisputed intervening acts of misconduct sever the causal connection (if any) between the protected conduct and the adverse employment decision.") (citations omitted). The sequence of events – Plaintiffs being terminated only days after an investigation revealed that they failed to routinely check in on a patient, falsified the board, and lied about the falsification – leads to only one conclusion: they were terminated for failing to provide patient care, falsifying the board, and lying about the falsification.

## V. PLAINTIFFS CANNOT PREVAIL ON THEIR RHODE ISLAND WHISTLEBLOWER PROTECTION ACT CLAIM FOR THE SAME REASONS THEY CANNOT SUCCEEED ON THEIR RETALIATION CLAIM.

The Rhode Island Whistleblowers Protection Act ("RIWPA") prohibits an employer from terminating or otherwise discriminating against an employee because the employee reports or is about to report a violation which the employee knows or reasonably believes has occurred, or is about to occur, of a federal or state law, rule or regulation to a public body or the employee's supervisor. R.I. Gen. Laws § 28-50-3. Although the Rhode Island Supreme Court has not expressly addressed the causation test applicable to RIWPA claims, courts analyzing such

claims, as well as those brought pursuant to similar statutes from other jurisdictions, have employed the framework established by the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Barboza v. Town of Tiverton*, No. 07-339-ML, 2010 WL 2231995, at *7 (D.R.I. June 2, 2010); *Babbitt v. PRI XVII, L.P.*, No. 07-274 S, 2009 WL 3450959, at *6 (D.R.I. Oct. 26, 2009); *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (evaluating claim under Maine Whistleblower Protection Act); *Woodford v. CVS Pharm., Inc.*, 905 F. Supp. 2d 418, 420 (D.R.I. 2012) (analyzing claim under Florida's whistleblower statute). Because the analysis for a RIWPA claim mirrors that of a retaliation claim under Title VII, FEPA and the RICRA, Plaintiffs' RIWPA claim should be dismissed for the same reasons stated *supra* in Section IV.

## VI. NEGLIGENT TRAINING AND NEGLIGENT SUPERVISION[10]

Plaintiffs' negligent training and supervision claim is misplaced because an employee is not permitted to bring such a claim against his own employer. As discussed below, Plaintiffs' negligent training and supervision claim should be dismissed for the following reasons: (1) only a third-party (as opposed to an employee) is permitted to assert such a claim; (2) Rhode Island's Workers' Compensation Exclusivity Provision precludes an employee from asserting such negligence claims against his employer; (3) the claim is preempted by Rhode Island and federal employment laws; and (4) Plaintiffs cannot establish the elements of the claim, even if the Court allowed them to pursue the claim.

**A.**  **The policy reasons underlying the creation of a negligent training and supervision claim expressly reject the notion that employees are permitted to sue their employers under this theory.**

---

[10] The torts of "negligent training" and "negligent supervision" are separate causes of action. *See Welsh Mfg. v. Pinkerton's, Inc.,* 474 A.2d 436, 442-443 (R.I. 1984). For the purpose of this motion, Defendants believe both claims fail for the same reasons.

When the Rhode Island Supreme Court adopted the principles of negligent training and negligent supervision, it unequivocally limited an employer's liability to third parties:

> [W]e align ourselves with the majority of jurisdictions that recognize the direct liability of an employer to *third parties* who are injured by acts of unfit, incompetent, or unsuitable employees.

*Welsh Mfg. v. Pinkerton's Inc.*, 474 A.2d 436, 438 (R.I. 1984) (emphasis added). "Indeed, an action for negligent hiring provides a remedy to injured *third parties* who would otherwise be foreclosed from recovery under the master-servant doctrine since the wrongful acts of employees in these cases are likely to be outside the scope of employment or not in furtherance of the master's business." *Id.* at 439 (emphasis added).

While Rhode Island courts have not directly addressed the issue of whether an employee is a third-party relative to its employer, two decisions from the Rhode Island Supreme Court indicate that it would conclude that employees are not considered third-parties vis-à-vis their employers. *See Boucher v. McGovern*, 639 A.2d 1369, 1374 (R.I. 1994) (declining to allow an employee to seek contribution from a co-worker as a joint tortfeasor because Rhode Island law "deems a master and a servant or a principal and an agent to be a single tortfeasor"); *Nunes v. Aiello*, 664 A.2d 1121, 1121-22 (R.I. 1995) (refusing to allow an employee to circumvent the workers' compensation laws to sue co-workers because plaintiff's theory of "dual liability" was "without merit").

Unlike injured third-parties who would be unable to recover against RIH, Plaintiffs have the ability to recover under a myriad of statutes; namely, those under which they have asserted claims in the Complaint: Title VII, the RICRA and FEPA. SOF ¶ 116. *Contra Welsh Mfg.*, 474 A.2d at 439 (negligent hiring provides a remedy for injured third-parties that would be prohibited from recovering from the employer because the wrongful acts were outside the scope of

employment).  The Rhode Island General Assembly and Congress have provided Plaintiffs with multiple statutory grounds to pursue their discrimination claims, which make the asserted claim of negligent training and negligent supervision superfluous.

**B.    Plaintiffs' negligent training and supervision claim is barred by Rhode Island's Workers' Compensation exclusivity provision.**

Rhode Island's Workers' Compensation Act ("RIWCA") provides the sole avenue of redress for employees who have suffered harm in the workplace.  *See, e.g., Nassa v. Hook-SuperRx, Inc.*, 790 A.2d 368, 373-74 (R.I. 2002) (the RIWCA is the exclusive remedy for claims against employers by employees for intentional infliction of emotional distress).  In order to accomplish this goal, the Rhode Island General Assembly included an exclusivity provision within the RIWCA, thereby barring an employee from recovery when he or she is entitled to recovery under the RIWCA.  *See* R.I.G.L. § 28-29-20.  "[T]he exclusivity clause is 'intended to preclude any common-law action against an employer, substituting a statutory remedy at the election of the employee when he enters employment.'"  *Folan v. State of R.I./DCYF*, 723 A.2d 287, 290 (R.I. 1999) (quoting *Hornsby v. Southland Corp.*, 487 A.2d 1069, 1072 (R.I. 1985)); *see also Nunes*, 664 A.2d at 1121-22 ("By virtue of [the exclusivity provision] an injured employee may not maintain a common law action against an employer for his or her injuries.")

The singular Rhode Island case addressing the viability of an employee's negligent training and negligent supervision claim against its employer held that the employee's claims were barred by the RIWCA's exclusivity provision.  *See DaPonte v. Ocean State Job Lot, Inc.*, No. WC-02-0646, 2009 R.I. Super. LEXIS 28, at *5-6 (R.I. Super. Ct. Mar. 4, 2009), *aff'd*, 21 A.3d 248 (R.I. 2011) (summary judgment granted on plaintiff's negligent hiring and supervision claim where defendant argued that the claims were barred by the workers' compensation exclusivity provision).  Numerous other courts have similarly held that an employee may not

pursue such a claim because of the workers' compensation laws. *See, e.g., Pickett v. Colonel of Specrfish*, 209 F. Supp. 2d 999, 1004-05 (D.S.D. 2001) (claims of negligent supervision are "just one more industrial mishap in the factory, of the sort [the employer] has the right to consider exclusively covered by the compensation system" and therefore fall "under the auspices of the Workers' Compensation statutes"); *Beaulieu v. Northrop Grumman Corp.*, 161 F. Supp. 2d 1135, 1148 (D. Haw. 2000) (negligent supervision and retention claims are work injuries arising from the conditions of plaintiff's employment and, therefore, barred by the workers' compensation exclusivity provision); *Silvestre v. Bell Atl. Corp.*, 973 F. Supp. 475, 486 (D.N.J. 1997) ("An employee cannot, however, assert negligent training and supervision against an employer. Under New Jersey law an action in negligence against an employer is barred by the New Jersey Workers Compensation Act."); *Irvin Investors, Inc. v. Sup. Ct.*, 800 P.2d 979, 982 (Ariz. Ct. App. 1990) (workers' compensation statute barred plaintiff's claims of negligent hiring, supervision and retention); *Downer v. Detroit Receiving Hosp.*, 477 N.W.2d 146, 148 (Mich. Ct. App. 1991) ("we find that plaintiff's [negligent hiring] claim is barred by the exclusive remedy provision of the Workers' Disability Compensation Act."); *Fields v. Cummins Emps. Fed. Credit Union*, 540 N.E.2d 631, 636 (Ind. Ct. App. 1989) (the plaintiff's "claim for negligent retention was premised on [her employer's] negligence in the employment relationship . . . such claims are barred by the exclusivity provision of the Worker's Compensation Act.").

Plaintiffs claim that RIH was negligent in training and supervising its agents, supervisors, and managers. Plaintiffs' claim clearly arises out of and directly deals with their employment. The RIWCA provides the exclusive remedy for work-related personal injuries, like the ones alleged by Plaintiffs. *See Nassa*, 790 A.2d at 372. Accordingly, Plaintiffs' negligent training

and supervision claim should be dismissed because it is barred by the RIWCA's exclusivity provision.

      **C.**      **Plaintiffs' negligent training and supervision claim is preempted by the comprehensive anti-discrimination statutory schemes designed to protect employees.**

Title VII and FEPA include comprehensive remedial statutory schemes that completely comprehend and envelop common law claims for discrimination and retaliation, and therefore, preempt Plaintiffs' negligent training and supervision claims. *See Taite v. Peake,* No. 08-cv-258-SM, 2009 U.S. Dist. LEXIS 2006, at *10 (D.N.H. Jan. 12, 2009) ("[T]he preemptive effect of Title VII . . . precludes plaintiff from proving her common-law claims with evidence of conduct, such as racial discrimination, that is prohibited by Title VII."); *Noel v. AT&T Corp.,* No. 4:12-cv-1673 CAS, 2013 U.S. Dist. Lexis 43628, at *16 (E.D. Mo. Mar. 27, 2013) (the Missouri Human Rights Act's statutory remedial scheme preempts any exceptions to the at-will doctrine related to race, color, gender, etc.). *See also Brown v. GSA*, 425 U.S. 820, 835 (1976) (Title VII "provides the ***exclusive*** judicial remedy for claims of discrimination in federal employment.") (emphasis added). If the Court were to allow Plaintiffs to proceed on their negligent training and supervision claim based on alleged discriminatory conduct, it would enable employees to side-step the administrative process (and deadlines). The Court would, therefore, unintentionally create a rather large exception to the administrative process designed to govern discrimination claims. Many of the courts that have addressed the issue have refused to allow employees to pursue such claims due to this concern. *See, e.g., Williams v. Thompson Corp.*, No. 00-2256(MJD/SRN), 2001 U.S. Dist. LEXIS 19041, at **6-7 (D. Minn. Aug. 13, 2003) (negligent supervision and retention claims preempted by MHRA, because such claims were based on alleged knowledge that employees committed discriminatory acts against

plaintiff); *Cannizzaro v. Neiman Marcus, Inc.*, 979 F. Supp. 465, 478-79 (N.D. Tex. 1997) (claims of negligent retention and supervision of sales manager who allegedly engaged in age discrimination was preempted by the TCHRA); *Wise v. Digital Equip. Corp.*, No. C9-94-461, 1994 Minn. App. LEXIS 1181, at *5 (Minn. Ct. App. Nov. 29, 1994), *aff'd*, 1995 Minn. LEXIS 77 (Minn. Jan. 25, 1995) ("Wise's negligence claims are not parallel with her sexual harassment claim, but rather are identical, and we agree with the trial court that they are preempted by MHRA."). Plaintiffs' negligent training and supervision claim is simply an employment discrimination claim masquerading as a negligence claim.

> **D.**      **Plaintiffs have failed to establish the elements of negligent training and supervision.**

Assuming, *arguendo*, that Plaintiffs' negligent training and supervision claim is not limited to third-parties, barred by the RIWCA's exclusivity provision or preempted by state or federal employment discrimination laws, Plaintiffs are ***still*** unable to establish the requisite elements of the claim. In order to establish a claim for negligent training or supervision, a plaintiff must show that the employer failed "to exercise reasonable care in [training or supervising] a person who the employer knew or should have known was unfit or incompetent for the employment, thereby exposing third parties to an unreasonable risk of harm." *Welsh Mfg.*, 474 A.2d at 440. Plaintiffs have failed to produce a single fact from which the Court could conclude that the Hospital failed to exercise reasonable care in training or supervising Salhany or any other employees.

## VII. RIH'S ALLEGED "POLICY" REQUIRING EMPLOYEES TO SPEAK ENGLISH IN CLINICAL AREAS DOES NOT VIOLATE THE LAW.

### A. Policies that require bi-lingual employees to speak English at work do not constitute national origin discrimination.[11]

Where, as here, an employee is bi-lingual, a rule requiring the employee speak one of the languages in which he or she is fluent in does not violate the law. *See, e.g., Garcia v. Gloor*, 618 F.2d 264, 272 (5th Cir. 1980) ("[A]n employer's rule forbidding a bilingual employee to speak anything but English in public areas while on the job is not discrimination based on national origin as applied to a person who is fully capable of speaking English and chooses not to do so in deliberate disregard of his employer's rule."); *Olivarez v. Centura Health Corp.*, 203 F. Supp. 2d 1218, 1221-25 (D. Colo. 2002) (English-only policies as applied to bilingual employees do not, alone, violate Title VII); *Kania v. Archd. of Phil.*, 14 F. Supp. 2d 730, 733 (E.D. Pa. 1998) ("courts have agreed that – particularly as applied to multi-lingual employees – an English-only rule does not have a disparate impact on the basis of national origin, and does not violate Title VII.") (surveying cases).

In *Cosme v. Salvation Army*, 284 F. Supp. 2d 229, 239 (D. Mass. 2003), which appears to be the only decision within the First Circuit that has addressed whether English-only rules as applied to bi-lingual employees provides a basis for recovery under anti-discrimination laws, the U.S. District Court for the District of Massachusetts held that "an English Language Policy does

---

[11] While it does not appear that the Court of Appeals for the First Circuit has addressed the issue, it is far from clear that it would equate issues related to a person's language with national origin discrimination. *See, e.g., Garcia v. Gloor*, 618 F.2d 264, 269 (5th Cir. 1980) (the EEO Act does not support an interpretation that equates the language an employee prefers to use with his national origin); *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983) ("Language, by itself, does not identify members of a suspect class."); *Napreljac v. John Q. Hammons Hotels, Inc.*, 461 F. Supp. 2d 981, 1029-30 (S.D. Iowa 2006) ("Language and national origin are not interchangeable."); *Brewster v. City of Poughkeepsie*, 447 F. Supp. 2d 342, 351 (S.D.N.Y. 2006) ("[Title VII] does not protect against discrimination on the basis of language."); *Long v. First Union Corp.*, 894 F. Supp. 933, 941 (E.D. Va. 1995) ("nothing in Title VII . . . provides that an employee has a right to speak his or her native tongue while on the job"), *aff'd*, 86 F.3d 1151 (4th Cir. 1996); *see also Smothers v. Benitez*, 806 F. Supp. 299, 306 (D.P.R. 1992) ("While language can be considered a mutable characteristic, it has immutable aspects. New languages can be learned and old ones forgotten; however, the knowledge of a language, insofar as it is an ethnic characteristic, leaves identifiable traces like accents, surnames, and behavior patterns.").

not, in and of itself, constitute discrimination or disparate treatment for bilingual employees." *Id.* at 239 (citations omitted).

It is undisputed that Plaintiffs – who took their deposition in English and worked with a population at RIH that was predominately English speaking – spoke English fluently. Indeed, as Plaintiffs acknowledge, the official language of Nigeria and Cameroon is English. Thus, RIH's alleged policy requiring individuals, including Plaintiffs, to speak English in certain areas at work when such individuals are fully capable of speaking the language is not discrimination based on national origin. *See Garcia*, 618 F.2d at 272.

**B.** **RIH's alleged policy that employees speak English in clinical areas does not violate the EEOC guidelines.**[12]

RIH's alleged policy that its employees speak English in clinical areas does not violate even the broadest interpretation of a national origin claim, which is encompassed in the EEOC guidelines. The EEOC guidelines provide that "an employer may have a rule requiring that employees speak only in English at ***certain times*** where the employer can show that the rule is justified by business necessity." 29 C.F.R § 1606.7(b) (emphasis added). Courts have routinely found that "certain times" English-only rules are permissible "when they are justified by a need to stem hostility between bilingual employees speaking a foreign language and employees who do not speak that language, as well as when English-speaking supervisors need to understand what is being said in a work area." *EEOC v. Sephora USA*, 419 F. Supp. 2d 408, 415 (S.D.N.Y.

---

[12] For the purposes of this motion, Defendants do not dispute the validity of the EEOC's guidance on this issue. However, the Court is not bound by the EEOC's regulations. *See Cosme v. Salvation Army*, 284 F. Supp. 2d 229, 240 (D. Mass. 2003) ("While the EEOC regulations may offer guidance to the Court, the Court is not bound by them."). *See also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) ("As an administrative interpretation of the Act by the enforcing agency, these Guidelines, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts . . . ***may*** properly resort for guidance.") (emphasis added, internal quotations and citations omitted); *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1489 (9th Cir. 1993) (invalidating EEOC guideline that allowed employee to establish a *prima facie* disparate impact case by merely proving existence of English-only policy; nothing in plain language of Title VII supported the guideline, and guideline contravened Supreme Court precedent by presuming, without requiring proof, that the policy had a disparate impact). Accordingly, Defendants reserve the right to dispute the validity of this regulation at a later time.

2005) (surveying cases); *Barber v. Lovelace Sandia Health Sys.*, 409 F. Supp. 2d 1313, 1328 (D.N.M. 2005) ("There is nothing inherently discriminatory about English-only policies established for legitimate business reasons.)

The EEOC has determined that a rule requiring employees to speak only English, when applied at all times, is presumed to violate Title VII and a English-only rule when applied only sometimes is permissible if based on business justification. *See Roman v. Cornell Univ.*, 53 F. Supp. 2d 223, 237 (N.D.N.Y. 1999) ("All decisions of which this Court is aware have held that English-only rules are not discriminatory as applied to bilingual employees where there is a legitimate business justification for implementing such a rule" and "[s]everal courts have held that an English-only policy designed to reduce intra-office tensions is a legitimate business reason."); *Smothers v. Benitez*, 806 F. Supp. 299, 308 (D.P.R. 1992) ("While a blanket English-only rule is considered by the EEOC to be a per se violation of Title VII, a limited English-only rule may be justified by business necessity."); *Gonzalez v. Salvation Army*, No. 89-1679–CIV–T-17, 1991 U.S. Dist. LEXIS 21692, at *7-8 (M.D. Fla. June 3, 1991) ("The enforcement of an English-only rule on an employer's premises under circumstances where co-employees who are working or customers who visit the employer's establishment for business purposes can overhear conversations is not a violation of Title VII . . . as applied to a person . . . who has the ability to speak English."), *aff'd*, 985 F.2d 578 (11th Cir. 1992), *cert. denied*, 508 U.S. 910 (1993); *Tran v. Standard Motor Prods., Inc.*, 10 F. Supp. 2d 1199, 1210 (D. Kan. 1998) (business necessity includes insuring that all workers can understand each other, preventing injuries, and preventing co-workers from feeling they are being talked about).

The only "English-only" policy Plaintiffs have identified is Akanji's November 21, 2012, email, which stated:

> During our meeting today 11/21/12, a discussion was raised about the use of a 2nd language on the floor. Please be cognizant of using other languages on the unit and around other staff, this may be perceived as been [*sic*] rude or disrespective [*sic*]. Thank you for your cooperation in regards to this matter.

SOF ¶ 78. As made clear by the above language, Akanji – who is also Black and Nigerian – only requested that employees be cognizant of using other languages "on the unit and around other staff." Thus, even assuming this email constitutes an "English-only policy," it is limited to certain times. In addition, even those that complained about this so-called policy, acknowledged the legitimate business justification for not speaking Nigerian in front of patients: "[b]ecause it's a medical unit" and "[t]hey don't understand it[.]" SOF ¶ 98. Furthermore, as courts have made clear, ensuring that all workers understand each other and that no one feels that they are being talked about is a business necessity that constitutes a legitimate justification for the policy. *See Tran*, 10 F. Supp. 2d at 1210. Therefore, RIH's "policy" requesting that employees speak English in clinical areas (after receiving a complaint from a staff member about the issue) does not amount to discrimination.

## CONCLUSION

RIH terminated Plaintiffs because they repeatedly failed to care for a patient on July 31, 2013, and then altogether lied about their care for said patient. Presented with this potentially life-threatening scenario, RIH decided to terminate Plaintiffs' employment. RIH's decision was completely reasonable. In light of the complete absence of any evidence which even *arguably* suggests Defendants' actions were related to any improper motive, Plaintiffs' claims must be dismissed.

RHODE ISLAND HOSPITAL and
LIFESPNAN CORPORATION,

By their attorneys,

/s/ Eric B. Mack
John D. Doran (#6415)
Eric B. Mack (#7784)
LITTLER MENDELSON, P.C.
One Financial Plaza, Suite 2205
Providence, RI  02903
T: 401.824.2500
F: 401.454.2969
jdoran@littler.com
Dated: December 20, 2017          emack@littler.com

## CERTIFICATE OF SERVICE

I, Eric B. Mack, certify that a true and accurate copy of the foregoing was filed and
served electronically by operation of the Court's CM/ECF System upon all counsel of record on
this 20th day of December, 2017.

/s/ Eric B. Mack
Eric B. Mack

Firmwide:151743629.3 057807.1078