UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| MOJISOLA AFOLABI, ELEANOR KILLI, DAVID ONASILE, OLAYIDE WILLIAMS, & OLUKEMI AKANJI )<br><br>PLAINTIFFS, )<br><br>v. )<br><br>LIFESPAN CORPORATION & RHODE ISLAND HOSPITAL, )<br><br>DEFENDANTS. ) | Civil Action No. 14-191-M<br><br>Civil Action No. 14-320-M |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFF OLUKEMI AKANJI

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and Local Rule 56.1, Defendant Rhode Island Hospital ("RIH" or the "Hospital") and Lifespan Corporation ("Lifespan")[1] (collectively, "Defendants"), by and through undersigned counsel, move for summary judgment on Plaintiff Olukemi Akanji's ("Akanji" or "Plaintiff") claims.

## INTRODUCTION

Plaintiff alleges a slew of claims under Title VII, the Rhode Island Fair Employment Practices Act ("FEPA"), the Rhode Island Civil Rights Act ("RICRA"), Rhode Island's Whistleblower Act, the Family Medical Leave Act ("FMLA"), the Rhode Island Parental and Family Medical Leave Act ("RIPFMLA"), and the common law. Plaintiff's claims are completely meritless because her employment relationship with RIH only ceased after she failed, despite multiple requests from RIH, to provide the appropriate documentation entitling her to a

---

[1] Defendant Lifespan Corporation is not a proper party to this litigation because it was not Plaintiff's employer. The only proper defendant in this case is Rhode Island Hospital.

1

leave of absence, or return from the unapproved leave of absence after being out of work for 32 days.

On September 26, 2013, Plaintiff commenced an unapproved leave of absence and never returned to work. That same day, RIH sent Plaintiff her medical leave of absence kit, which included all of the paperwork Plaintiff needed to complete in order to request a leave of absence. The paperwork was due on October 11, 2013. RIH contacted Plaintiff numerous times regarding her failure to provide the necessary documentation, and provided Plaintiff with multiple extensions. On October 22, 2013, Plaintiff provided documentation that was altogether deficient. The very next day, RIH informed Plaintiff that the submitted paperwork was deficient because the condition identified (hypertension/stress) did not meet the FMLA's definition of a serious health condition and the submission failed to identify a treatment plan within thirty days of Plaintiff's disability. Plaintiff had until October 30, 2013 to resolve these deficiencies. On November 1, 2013, because Plaintiff still had not cured the defect, RIH sent a final letter to Plaintiff notifying her of the above and indicating that, due to being out on an unapproved absence, she had to return to work by November 11, 2013.

Despite the Hospital's numerous attempts, Plaintiff failed to either cure the defects in her paperwork or return to work. As a result, Plaintiff was out on a 32 day unapproved leave of absence and did not provide any indication of her return. Based on these facts, her employment with RIH ceased on or about November 14, 2013. The cessation of Plaintiff's employment relationship with RIH was completely reasonable, especially given that she was familiar with the Hospital's leave of absence policy and took an approved leave of absence prior to September 2013. In light of the complete absence of any evidence that suggests the Hospital's actions were related to any improper motive, Plaintiff's claims must be dismissed.

## BACKGROUND FACTS

### I.     PLAINTIFF'S EMPLOYMENT HISTORY AT RIH.

#### A.     Background.

Plaintiff is Nigerian and black.  Defendants' Local Rule 56(a) Statement of Undisputed Facts ("SOF") ¶ 1.  The official language of Nigeria is English, although many Nigerians also speak a dialect called Yoruba.  SOF ¶ 2.  Plaintiff was hired by RIH in March 2005 as a Professional Nurse 1 in the Adult Patient Services-Psychiatry Department on Jane Brown, 4 South ("JBS4").  SOF ¶ 3.  In January 2010, Plaintiff was promoted to Assistant Clinical Manager ("ACM") on JBS4.  SOF ¶ 4.  As an ACM, Plaintiff was involved in disciplinary action, as well as working with employee health regarding leaves of absence.  SOF ¶ 5.

#### B.     Plaintiff initiates the alleged "English-only" policy, for which she now claims was discriminatory.

On November 13, 2012, Theresa Carrier ("Carrier"), a floating Certified Nursing Assistant, sent an email to Christina Gomes, Manager of the Float Staff, titled, "Question about staff talking another language on the job."  SOF ¶ 6.  The prior day, Carrier worked on Jane Brown, 3-South, and she claimed that "all the staff were talking in African language."  SOF ¶ 7.  Carrier's email stated the staff made her feel "very uncomfortable."  SOF ¶ 8.  When Carrier complained to another CNA about everyone speaking a different language, a Registered Nurse told her, "[t]oo bad" and they kept speaking their language.  SOF ¶ 9.  The email was forwarded to Plaintiff because she was responsible for managing the floor at the time.  SOF ¶ 10.  A meeting was subsequently held with all managers, during which time Ellen Lebeuf ("Lebeuf"), Director of Nursing, asked Plaintiff to address the issue.  SOF ¶ 11.

On November 21, 2012, approximately a week after Carrier's complaint, **Plaintiff** sent

out an email to the entire unit titled, "Use of Other Languages." SOF ¶ 12. Plaintiff's email

stated:

> During our meeting today 11/21/12, a discussion was raised about the use of a
> 2nd language on the floor. Please be cognizant of using other languages on the
> unit and around other staff, this may be perceived as been [*sic*] rude or
> disrespectful [*sic*]. Thank you for your cooperation in regards to this matter.

SOF ¶ 13. While Lebeuf asked Plaintiff to address the issue, she did not tell Plaintiff what to

write. SOF ¶ 14. Notably, when Plaintiff sent the email out, Joan Salhany ("Salhany"), who

Plaintiff now claims is the individual who discriminated against her, was not even working at

RIH and did not "have anything to do with it." SOF ¶ 15. Plaintiff acknowledges that there was

no reason for staff members to speak any language other than English on the Unit. SOF ¶ 16.

Despite this so-called policy, Plaintiff was never disciplined, nor disciplined anyone else, for

speaking a language other than English at work. SOF ¶ 17. The reason for the alleged policy

was "[b]ecause it's a medical unit" and the patients "don't understand" Nigerian. SOF ¶ 18.

**C.      Plaintiff is placed on a Corrective Action Plan due to her performance.**

In February 2013, Salhany became RIH's Director of the Psychiatry. SOF ¶ 19. Upon

her hire, Salhany discovered serious issues related to Plaintiff's leadership, organization, and

professionalism on the JBS4. SOF ¶ 20. Salhany met with Plaintiff several times to discuss

these specific issues and the need for immediate improvement. SOF ¶ 21.

Plaintiff's performance did not improve; as a result, on July 18, 2013, Plaintiff was

placed on a Corrective Action Plan ("CAP"). SOF ¶ 22. The CAP included a thorough

description of areas where Plaintiff's performance, specifically her leadership and management,

required improvement, and provided specific mechanisms (such as attending a Leadership

Mentoring program at the Lifespan Learning Institute) that Plaintiff needed to utilize to improve

in the identified areas. SOF ¶ 23. The CAP indicated that its goals must be completed, with the issues identified and resolved, within 6 weeks of the date it was issued (i.e., by September 30, 2013). SOF ¶ 24.

After issuing the CAP, Salhany met with Plaintiff on July 24, 2013 to address incidents on July 21, 22, 23 and 24 that evidenced additional instances of Plaintiff's poor leadership and management. SOF ¶ 25. One of the issues discussed was that Plaintiff failed to respond to a page from JBS4 when she was the ACM on call on July 21. SOF ¶ 26. Plaintiff went out on an approved vacation from August 12 through September 3, 2013. SOF ¶ 27. A few weeks later, during the weekend of September 21 through September 22, Plaintiff again failed to respond to a page from JBS4 when she was the ACM on call. SOF ¶ 28. As a result, the other ACM, who was not on call, was contacted by the staff and, though off duty, resolved the situation. SOF ¶ 29. After berating the other ACM for covering for her, Plaintiff called Salhany and screamed at her. SOF ¶ 30.

## II. PLAINTIFF NEVER RETURNS TO WORK AFTER BEING OUT ON A 32 DAY UNAPPROVED LEAVE OF ABSENCE, DURING WHICH TIME SHE REPEATEDLY FAILED TO CURE THE DEFECTS IN HER LOA PAPERWORK.

On September 26, 2013, only four days after Plaintiff again failed to respond to a page when she was the ACM on call, Plaintiff went out on an unapproved leave. SOF ¶ 31.[23] That same day, Sandra Badessa ("Badessa"), Senior Human Resources Representative, sent Plaintiff her medical leave of absence kit ("LOA Kit"), which included all of the paperwork Plaintiff (or her doctor) needed to complete in order for her to receive a leave of absence. SOF ¶ 36.

---

[2] Plaintiff admittedly took an approved leave of absence prior to September 2013. SOF ¶ 33.

[3] Plaintiff submitted a doctor's note to the Employee Occupation and Health Office ("EOHS") indicating that she would be out from September 26, 2013 through October 10, 2013. SOF ¶ 34. The doctor's note did not indicate a reason for Plaintiff's absence. SOF ¶ 35.

Specifically, the LOA Kit included a Request for Leave of Absence Form (Form A) and Certificate of Health Provider Form (Form B). SOF ¶ 37. Plaintiff was well-aware of the fact that the paperwork was due by October 11, 2013. SOF ¶ 38.

On October 1, 2013, while out on the unapproved leave, Salhany received a letter from Plaintiff (dated September 23, 2013) in which Plaintiff argued the merits of the July 18 CAP—despite it being issued two months prior—and accused Salhany of abusing, harassing and threatening her. SOF ¶ 39. On October 8, 2013, Salhany wrote back stating that she wished Plaintiff a speedy recovery and that they could discuss Plaintiff's questions about the CAP upon her return. SOF ¶ 40. Salhany also commented in her letter that she noticed Plaintiff's office and file drawers had been emptied out and if Plaintiff had mistakenly removed any of the Hospital's files or property when she left, Salhany wished to make arrangements for their safe return to the Hospital. SOF ¶ 41. Salhany concluded her letter by stating, "I look forward to your return to work." SOF ¶ 42.

Plaintiff failed to provide the necessary paperwork by October 11, 2013. SOF ¶ 43. As a result, on October 11, 2013, Kelly L. Dean, Assistant to Stephanie O'Hanley, Leave of Absence Coordinator, informed Plaintiff that she failed to submit her requisite paperwork to the EOHS Office, as indicated in her LOA Kit. SOF ¶ 44. Rather than terminating her for failing to provide such documentation, the Hospital gave Plaintiff an extension, allowing her to provide the necessary documentation by October 25, 2013. SOF ¶ 45. Dean further informed Plaintiff that, if she failed to provide the documentation by October 25th, she could be terminated. SOF ¶ 46.[4]

On October 15, 2013, Stephanie O'Hanley ("O'Hanley") wrote to Plaintiff regarding her failure to provide the required documentation to the EOHS Office. SOF ¶ 48. O'Hanley's letter

---

[4] Rather than respond to the jeopardy letter, on October 15, 2013, Plaintiff responded to Salhany's October 8th letter, indicating that she was "disappointed" that Salhany would not address her September 23rd letter until she returned to work. SOF ¶ 47.

informed Plaintiff that she had to provide the necessary documentation by October 22, 2013 and to disregard the previous jeopardy letter sent by Dean. SOF ¶ 49. O'Hanley's letter reiterated that if Plaintiff failed to provide the documentation by October 22nd, she could be terminated. SOF ¶ 50.

Plaintiff provided the necessary documentation on October 22, 2013—the last day possible. SOF ¶ 51. The documentation provided stated that Plaintiff was out on leave due to hypertension and stress, and did not provide any treatment plan. SOF ¶ 52. In addition, Plaintiff's doctor, Dr. Ruggieri, left Section 5(A) of Form B (which requested the approximate date that Plaintiff's condition started and the probable duration of the condition, as well as the probable duration of Plaintiff's present incapacity, if different) blank. SOF ¶ 53.[5] Thus, when Plaintiff finally provided her documentation to the EOHS Office, it was altogether deficient. SOF ¶ 55.

As a result, the *very next day*, O'Hanley *again* wrote to Plaintiff, this time informing her that her submitted paperwork was insufficient because it 1) did not meet the FMLA's definition of a serious health condition *and* 2) failed to identify the treatment plan within thirty days of Plaintiff's disability. SOF ¶ 56. RIH gave Plaintiff another extension, this time to October 30, 2013, to resolve the deficiency. SOF ¶ 57.

Plaintiff did not resolve the deficiencies by October 30, 2013. On November 1, 2013, because Plaintiff still did not cure the defect, Badessa sent a *final letter* to Plaintiff notifying her of all the extensions already provided and indicating that, due to her being out on an unapproved leave, she had to return to work by November 11, 2013 in order to maintain her employment. SOF ¶ 58. RIH, *once again* provided Plaintiff with an extension. SOF ¶ 59. Plaintiff did not

---

[5] On his own form letterhead, Dr. Ruggieri indicated that Plaintiff "is under my care and should be released from work/school from 10-25 through 11-8." SOF ¶ 54.

request another extension of time to submit the supporting documentation, cure the defect, or return to work by November 11, 2013. SOF ¶ 60. Despite the Hospital's numerous attempts to help Plaintiff properly secure a leave of absence, Plaintiff remained on an unapproved absence for a total of 32 days. Based on these facts, Plaintiff's employment relationship with RIH ceased.[6] On or about November 14, 2013, Plaintiff was notified that because she failed to return to work by November 11, 2013, RIH was no longer able to maintain her employment. SOF ¶ 62.

## III. PLAINTIFF MAKES A SERIES OF COMPLAINTS AFTER SHE IS PLACED ON THE CORRECTIVE ACTION PLAN.

Sometime in 2013, ***after she received her Corrective Action Plan***, Plaintiff complained to Barbara Reilly, Vice President of Nursing, and Doug MacNeil, Director for Human Resources, about Salhany. SOF ¶ 63. As part of her complaints, Plaintiff alleged that she was treated differently from her colleague, Susan Burton, because Burton was part of the decision-making process for employees, whereas Plaintiff allegedly was not. SOF ¶ 64. Notably, Plaintiff did not make a single complaint against Salhany before she was placed on the CAP. SOF ¶ 65. Furthermore, Plaintiff neither complained about nor alleges that anyone else at RIH treated her disparately. SOF ¶ 66.

Plaintiff also claimed that, sometime in 2013, Karen Potter ("Potter") mocked and mimicked her accent. SOF ¶ 67. In addition, and for the very first time during her deposition, Plaintiff claimed that Potter also called her the "n word." SOF ¶ 68. Plaintiff did not allege this in her Charge, the Complaint, or Answers to Interrogatories. SOF ¶ 70. Although Plaintiff was unsure as to the exact time in which Potter made these comments, she insisted she reported the

---

[6] Notably, Salhany had absolutely no involvement in RIH's requirement for Plaintiff to return to work by November 11, 2013. SOF ¶ 56.

comments to Salhany and Badessa. SOF ¶ 71.[7]  Plaintiff also testified that staff members would talk about her accent, the way she walked, and her hair, but did not provide any additional information or report the conduct to anyone at RIH. SOF ¶ 73.

## IV.   PLAINTIFF FREELY ADMITS THAT SHE WAS COMPLETELY CAPABLE OF WORKING DURING THE TIME PERIOD SHE WAS SEEKING A LEAVE OF ABSENCE FROM RIH.

Several times throughout her deposition, Plaintiff testified that she was able to work while on her unapproved leave of absence.   On October 22, 2013, while still employed at RIH and out on unapproved leave, Plaintiff informed her doctor that she was "looking for other work." SOF ¶ 75.  When questioned about this during her deposition, Plaintiff testified that she was "probably" looking for other work, despite the fact that she was simultaneously telling RIH that she could not work because of an alleged disability. SOF ¶ 76.  Plaintiff also testified that if she had received a job at one of the companies for which she applied while out on leave, she would have accepted it and been able to work there immediately. SOF ¶ 77.

On December 24, 2013, Plaintiff sent a letter to a whole host of people at RIH, claiming that she was "well, alive, and doing great." SOF ¶ 78.  When asked whether this meant she was able to work, Plaintiff unequivocally testified that she was "[o]f course" able to work. SOF ¶ 79.  However, in her December 30, 2013 Temporary Disability Insurance (TDI) form, Plaintiff wrote that she was unable to work in December 2013. SOF ¶ 80.

In addition, on a 2015 employment application, Plaintiff indicated that she left RIH "to care for an elderly parent"—not because she suffered from a disability that prevented her from working. SOF ¶ 81.  When asked whether this reason was in fact true, Plaintiff unequivocally testified, "[y]es." SOF ¶ 82.

---

[7] Badessa testified that she does not recall Plaintiff ever reporting either comment to her. SOF ¶ 72.

<u>**ARGUMENT**</u>

**I.     STANDARD OF REVIEW.**

Rule 56 of the Federal Rules of Civil Procedure governs the process of summary judgment. Summary judgment is appropriate when (1) the moving party demonstrates the absence of any genuine issue of material fact and (2) the non-moving party fails to demonstrate that a trier of fact could reasonably resolve that issue in a non-movant's favor. *Borges v. Serrano-Isern*, 605 F.3d 1, 4 (1st Cir. 2010). In an employment discrimination case, "[t]he plaintiff must do more than cast doubt on the wisdom of the employer's justification; to defeat summary judgment, the plaintiff must introduce evidence that the real reason for the employer's action was discrimination." *Villanueva v. Wellesley Coll.*, 930 F.2d 124, 127-28 (1st Cir. 1991). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no ***genuine*** issue of ***material*** fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

**II.     PLAINTIFF WAS NOT SUBJECTED TO A HOSTILE WORK ENVIRONMENT.[8]**

To prevail on her hostile work environment claim, Plaintiff must prove, *inter alia*, that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations omitted). Neither Rhode Island law nor Title VII are intended to create a civility code in the workplace. *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 37 (1st Cir. 2003). Rather, the work environment "must be both objectively and subjectively offensive, one that a

---

[8] While it is not completely clear that Plaintiff is asserting a hostile work environment claim, some of the allegations could be interpreted as such.

reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

The substance of Plaintiff's hostile work environment claim are comments allegedly made by a subordinate employee. SOF ¶ 68. During her deposition, and for the very first time, Plaintiff alleged that, at some point in time in 2013, Karen Potter called her the "n word." SOF ¶ 68. Notably, Plaintiff did not make mention of this comment in her Charge, the Complaint, Answers to Interrogatories, or at any other point in time prior to her deposition. SOF ¶ 69. When further probed about this comment, Plaintiff was unsure when the comment was made, but insisted that she reported the comment to Salhany and Badessa. SOF ¶ 71.

Even if muttered, this statement is insufficient to demonstrate that RIH was both objectively and subjectively offensive, such that a reasonable person would find hostile or abusive. The First Circuit, along with other courts, has found that **more frequent** incidents of racially suggestive comments were not severe or pervasive enough to alter the conditions of employment as a matter of law. *See Thompson v. Coca-Cola Co.,* 522 F.3d 168, 180-81 (1st Cir. 2008) (three racially suggestive comments did not amount to a pervasive hostile work environment); *see also Manatt v. Bank of Am., NA,* 339 F.3d 792, 795–99 (9th Cir. 2003) (coworkers' use of the term "China-man," ridicule of the plaintiff's mispronunciation of English words, statement that "I've had the worst kind of trouble with your countrymen," and coworker's manipulation of own eyes to make them appear slanted insufficient to create hostile work environment). Nor does the offensiveness of the "n word" serve to raise the incident to the level of severity required to establish actionable harassment. *See Harris*, 510 U.S. at 21 ("mere utterance of an [] epithet which engenders offensive feelings in an employee, does not sufficiently affect the conditions of employment" to be actionable); *Smith v. N.E. Ill. Univ.*, 388

F.3d 559, 566 (7th Cir. 2004) ("the mere utterance of an … epithet which engenders offensive feelings in an employee" does not amount to a hostile work environment even though the plaintiff was referred to, but not in his presence, as a "black motherf----er"); *Shen v. Biogen Idec Inc.*, 523 F.Supp.2d 48, 56-57 (D. Mass. 2007) ("One dubiously racist comment, assuming it was made, cannot suffice to permeate the workplace with the abuse required by the Supreme Court."). Just as in all of these cases, the conduct at issue here was not severe or pervasive.[9]

Plaintiff also alleges, without providing any additional corroborating or identifying facts, that Potter mocked and mimicked her accent. SOF ¶ 67. In addition, Plaintiff testified that staff members would talk about her accent, the way she walked, and her hair. SOF ¶ 73. Plaintiff did not, however, provide any additional information or report this conduct to anyone. SOF ¶ 74. Even with the consideration of these alleged comments, Plaintiff's hostile environment claim still fails. *See Thompson,* 522 F.3d at 180-81.

## III. PLAINTIFF DID NOT QUALIFY FOR FMLA OR RIPFMLA LEAVE.

### A. Plaintiff's medical certification was insufficient to establish that she suffered from a "serious health condition."

To qualify for leave under the FMLA or RIPFMLA, Plaintiff must have certified that she suffered from a "serious health condition." Plaintiff's doctor, Dr. Richard J. Ruggieri, wrote on her certification she suffered from "HTN [hypertension]" and "stress." SOF ¶ 52. In order for Plaintiff's hypertension and/or stress to constitute a "serious health condition," Plaintiff was required to satisfy 29 USCS § 2613 (b) and 29 CFR § 825.305, both of which govern certifications. Pursuant to 29 USCS § 2613 (b), when requested by an employer, an employee

---

[9] Moreover, even if Potter did make such comment, summary judgment is still appropriate as RIH is only liable for the harassing conduct of a non-supervisory employee *if* the employer knew or should have known about the harassment, yet failed to take prompt remedial action to stop it. *Crowley v. L.L. Bean, Inc.*, 303 F.3d 387, 401 (1st Cir. 2002). Plaintiff altogether failed to even mention such comment in her allegations. SOF ¶ 68. Furthermore, Badessa does not recall Plaintiff ever reporting such comment. SOF ¶ 72. Thus, RIH clearly had no knowledge that any such comment was made and therefore cannot be found liable.

applying for FMLA leave **must** submit a certification stating, *inter alia*, **(1) the date on which the serious health condition commenced and (2) the probable duration of the condition**. The certification must be "complete and sufficient[.]" 29 CFR § 825.305 (c). If the certification is incomplete or insufficient, "the employer must provide the employee with seven calendar days to cure any such deficiency." *Id.* If the deficiencies are not cured, "**the employer may deny the taking of FMLA leave**, in accordance with § 825.313." *Id.* (emphasis added); *see also Baldwin-Love v. Elec. Data Sys. Corp.*, 307 F. Supp. 2d 1222, 1229 (M.D. Ala. 2004) ("An employee's right to FMLA leave is subject to the certification requirements of 29 U.S.C. § 2613 . . . Failure to meet the certification requirements renders the employee's absences unprotected by the FMLA.").

Courts have strictly applied these certification requirements. *See Muhammad v. Ind. Bell Tel. Co.*, 182 Fed. Appx. 551, 554 (7th Cir. 2006) (holding that summary judgment was appropriate where plaintiff failed to submit proper certification and was terminated as her leave was not protected under the Act); *Whitworth v. Consol. Biscuit Co.*, No. 6:06-112-DCR, 2007 U.S. Dist. LEXIS 25971, at *28 (E.D. Ky. Apr. 6, 2007) ("Congress did not intend [t]he slings and arrows of everyday life . . . to be the stuff of a federal statute, nor federal litigation based on it . . . Plainly, . . . Congress sought to protect employees suffering from serious illnesses only.") (citations and internal quotations omitted); *Baldwin-Love*, 307 F. Supp. 2d at 1229 (granting summary judgment for employer where employer terminated employee because employee's certification failed to show she was incapable of working).

Furthermore, employers have successfully won summary judgment where, as here, a certification was deficient because it failed to state the date a plaintiff's condition began and/or its expected duration. *See, e.g., Roundtree v. Securitas Sec. Servs.*, No. 3:10-cv-778 (JCH), 2012

U.S. Dist. LEXIS 24785, at *15 (D. Conn. Feb. 27, 2012) (granting summary judgment in favor of the employer when the plaintiff's certification "(1) failed to state the date on which [his] 'anxiety, hypertension, and sleep dysfunction' commenced;" and "(2) did not provide any estimate of the probable duration of [his] condition.");[10] *Novak v. MetroHealth Med. Ctr.*, 503 F.3d 572, 578 (6th Cir. 2007) (affirming the district court's determination that the plaintiff was not entitled to FMLA leave because the plaintiff, who suffered a serious health condition related to his back, submitted a certification form that "did not contain the date on which the serious health condition began, the probable duration of the condition, or the appropriate medical facts within the health care provider's knowledge").

Here, RIH inquired about the date on which Plaintiff's serious health condition commenced, and the probable duration of the condition. Specifically, in Section 5(A) of Form A, RIH asked Plaintiff or her doctor to "[s]tate the approximate date the condition started and the probable duration of the condition" and "the probable duration of the patient's present incapacity if different." SOF ¶ 53. Dr. Ruggieri left this section blank. *Id.* Dr. Ruggieri indicated Plaintiff "is under my care and should be released from work/school from 10-25 through 11-8." SOF ¶ 54. This information **still** left open the questions of (a) when Plaintiff's condition started; and (b) the probable duration of her condition (which is different than the dates she should be released from work).

In accordance with 29 CFR § 825.305(c), RIH informed Plaintiff, in a letter dated October 23, 2013, that "the submitted Certification of Health Care Provider does NOT meet FMLA's definition 'serious health condition' nor identify treatment plan within 30 days of

---

[10] The plaintiff claimed he suffered from these conditions due to a hostile work environment and had faxed a doctor's note that stated he "had been under the doctor's care since 8/7/08," that he suffered from "anxiety, hypertension [and] sleep dysfunction," and that the date on which he would be able to return to work was "to be determined." *Id.* at *9. The court found "that the doctor's note provided by the plaintiff with his initial fax did not constitute sufficient certification." *Id.* at *15

disability." SOF ¶ 56. RIH gave Plaintiff the opportunity to cure her deficiency within seven days, which she failed to do. SOF ¶ 57. Again, in a letter dated November 1, 2013, RIH informed Plaintiff that "the health certification form that was received did not meet FMLA's definition of a serious health condition." SOF ¶ 58. Plaintiff *never* attempted to cure this alleged defect. SOF ¶ 60. Because Plaintiff's certification form was deficient and she failed to cure it, RIH could no longer allow Plaintiff—who had already been out of work for 32 days—to remain on the unapproved leave of absence.

### C. Plaintiff was fully capable of working while on the unapproved leave of absence.

Even if Plaintiff did provide the aforementioned certification, she was nonetheless fully capable of returning to work. Although Plaintiff's doctor's note stated that she was unable to work, SOF ¶¶ 52 and 53, Plaintiff's testimony revealed that she was not incapacitated, but instead, able to work while on her leave of absence.

On October 22, 2013, while still employed at RIH and out on unapproved leave, Plaintiff informed her doctor that she was "looking for other work." SOF ¶ 75. When questioned about this statement during her deposition, Plaintiff admitted she was "probably" looking for other work. SOF ¶ 76. Plaintiff also admitted that if she had received a job at one of the companies for which she applied while out on leave, she would have accepted it and been able to work there immediately. SOF ¶ 77. Plaintiff further testified, despite indicating otherwise on her December 2013 application for temporary disability, that during this time she was, "[o]f course," able to work. SOF ¶ 79.[11] Clearly, based on her own testimony, Plaintiff was completely able to work during the entire time she was claiming she was disabled.

---

[11] In addition, on a 2015 employment application, she indicated that she left RIH "to care for an elderly parent"—not because she suffered from a disability that prevented her from working. SOF ¶ 81. When asked whether this reason was in fact true, Plaintiff unequivocally stated "[y]es." SOF ¶ 82.

### III. PLAINTIFF CANNOT PREVAIL ON HER DISPARATE TREATMENT CLAIMS UNDER TITLE VII, FEPA, RICRA, FMLA, OR RIPFMLA.

Plaintiff alleges she was terminated, in violation of Title VII (Count I), FEPA (Count II), RICRA (Count III), FMLA or RIFMLA (Count VI). To establish a *prima facie* case under each of these statutes, Plaintiff must show, *inter alia*, that she suffered an adverse action and was performing her job at a level that rules out the possibility that the termination was because of inadequate job performance. *See Babbitt v. PRI XVII, L.P.*, No. 07-274 S, 2009 WL 3450959, at *6 (D.R.I. Oct. 26, 2009) (to prevail on a Title VII claim, plaintiff must demonstrate she suffered an adverse action); *Horn v. S. Union Co.*, No. 04-434S, 2008 WL 2466696, at *7 fn. 5 (D.R.I. June 18, 2008) ("Case law developed under Title VII . . . is 'routinely applied' to claims brought pursuant to FEPA and RICRA.") (internal citations omitted); *Ameen v. Amphenol Printed Circuits, Inc.*, 777 F.3d 63, 69 (1st Cir. 2015) (applying the *McDonnell Douglas* burden shifting paradigm to the FMLA).

#### A. Plaintiff did not suffer an adverse action because she voluntarily abandoned her job.

To be an adverse action, the employer's conduct must be materially adverse to the employee's job status. *See Gibbs v. Brown Univ.*, C.A. No. 09-CV-392-ML, 2011 WL 1299950, at *4-5 (D.R.I. Mar. 31, 2011) (dismissal warranted for claims of plaintiff who could not establish adverse action element of *prima facie* case). The action must result in a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits. *Id.* Here, RIH took no such action. Instead, Plaintiff abandoned her job.

"Abandoning one's job is the equivalent of resigning from a job; it is not an action taken by the employer, but one taken by the employee." *Adams v. Verizon N.Y., Inc.*, No. 04 CIV.

4314 (MGC), 2008 WL 2047815, at *4 (S.D.N.Y. May 13, 2008). When an employee abandons her job, she "cannot establish her *prima facie* case because she cannot show that she suffered an adverse action[.]" *Mihalik v. Illinois Trade Ass'n*, No. 93 C 6782, 1995 WL 29612, at *4 (N.D. Ill. Jan. 24, 1995). In *Mihalik*, the court found that plaintiff, who brought home virtually all of her personal belongings home and expressed that she did not want to submit to a psychological examination—a requirement for her job, abandoned her job. *Id.* The court explained that, by engaging in such activity, the plaintiff essentially quit her job prior to being fired. *Id.* Thus, the plaintiff did not suffer an adverse action, and therefore, did not establish a *prima facie* case of retaliation. *Id.*

Here, Plaintiff went out on an unapproved leave on September 26, 2013, and never returned to work. SOF ¶ 32. Days before Plaintiff took her unapproved leave, she cleaned out her office and file drawers. SOF ¶ 31. Realizing this, Salhany contacted Plaintiff and stated that if she "mistakenly removed hospital files or records, [the Hospital] would like to make arrangements with [Plaintiff] for [her] to return them as soon as possible." SOF ¶ 41. Salhany further told Plaintiff that she "look[ed] forward to [her] return to work." SOF ¶ 42.

While out on her unapproved leave, RIH contacted Plaintiff **numerous times** requesting that she provide sufficient documentation entitling her to FMLA leave, so that RIH could maintain her position until Plaintiff's hopeful return. SOF ¶¶ 36, 44, 48, 51, and 56. Plaintiff altogether failed to provide documentation entitling her to approved leave. SOF ¶¶ 43, 56, 58. The Hospital finally requested, in its November 1, 2013 letter, that Plaintiff return to work by November 11, 2013. SOF ¶ 58. The letter stated that Plaintiff's failure to return to work would indicate that she no longer wished to maintain her employment relationship with RIH. *See id.* Clearly, RIH did not want to terminate Plaintiff; it simply wanted her to return to work. *See id.*

Plaintiff, however, did not want to return to work; she made no attempt to return, never contacted the Hospital to express an interest in returning, and did not inform management when she would be able to return. SOF ¶ 60.

What is more, during her deposition, Plaintiff acknowledged she did not have any intention to return to work. While still employed at RIH, but out on the unapproved leave, Plaintiff informed her doctor that she was "looking for other work." SOF ¶ 75. When asked about this during her deposition, Plaintiff confirmed that she was looking for work and if she had received a job at one of the other companies for which she applied while out on leave, she would have accepted the position and began working immediately. SOF ¶¶ 76, 77. It was reasonable for RIH to interpret Plaintiff's actions as constituting abandonment of her job. Because Plaintiff abandoned her job, she did not suffer an adverse action. *See Mihalik*, 1995 WL 29612, at *4. For this reason, Plaintiff cannot establish a *prima facie* case of violations under Title VII, RICRA, FEPA, FMLA, or RIPFMLA.[12]

> **B.** **Assuming, *arguendo*, the Court finds that Plaintiff did not abandon her job, but instead was terminated, she still cannot establish a *prima facie* case as Plaintiff was not performing her job at an adequate level.**

Even if this Court finds that Plaintiff was terminated, she still cannot establish her *prima facie* case because her excessive absenteeism—amounting to ***at least*** 32 days—establishes that she was not performing her job at an adequate level. There is no question that excessive attendance problems defeat Plaintiff's *prima facie* case because such conduct demonstrates that the plaintiff was not performing her job in a satisfactory manner. *See Perez v. Communications Workers of Am.*, 210 Fed. Appx. 27, 31 (2d Cir. 2006) (plaintiff's excessive absenteeism rose to the level of unsatisfactory job performance); *Young v. Ben Franklin Transit*, 83 Fed. Appx. 900

---

[12] RIH further notes that even if this Court finds that Plaintiff did not abandon her job, but instead, was terminated, the Hospital maintains that Plaintiff's *prima facie* case nonetheless fails because she has not—and cannot—prove that her termination was in any way related to her race, color, national origin, or alleged protected conduct.

(9th Cir. 2003) (plaintiff did not establish a *prima facie* case for disability discrimination through disparate treatment because excessive absenteeism prevented her from completing satisfactory work); *Jones v. Sprint Int'l*, No. 96-1180, 1996 WL 558371 , at *1-2 (4th Cir. Oct. 2, 1996) (same). Because Plaintiff remained out of work for approximately 32 days, without approval, she was not performing her job at a satisfactory manner.

**C.**     **Job abandonment is a legitimate, non-discriminatory and non-retaliatory reason for termination.**

Furthermore, assuming, *arguendo*, Plaintiff could establish her *prima facie* case of violations under Title VII, RICRA, FEPA, FMLA, or RIPFMLA – which she cannot – the Hospital had a legitimate, non-discriminatory and non-retaliatory reason for its action: Plaintiff's excessive unapproved absence that equated to job abandonment. Many courts have found excessive absenteeism, which amounts to job abandonment, to be a non-discriminatory, non-retaliatory, legitimate reason for termination. *See, e.g., Brown v. The Pension Bds.,* 488 F. Supp. 2d 395, 403, 406, 410 (S.D.N.Y. 2007) (holding that job abandonment was a legitimate, non-discriminatory cause for termination after plaintiff was absent without leave for two days in a row); *Egbarin v. Am. Express Co.,* 451 F. Supp. 2d 413, 423 (D. Conn. 2006) (job abandonment was a legitimate, non-retaliatory basis for termination of plaintiff, who took an unapproved ten-day absence); *Perkins v. Mem'l Sloane-Kettering Cancer Ctr.,* No. 02 Civ. 6493 (RJH), 2005 WL 2453078, at *19-22 (S.D.N.Y. Sept. 30 2005) (job abandonment was a legitimate business reason for terminating plaintiff who did not show up for performance evaluation, but issue of fact existed whether plaintiff was told to attend the meeting); *Jackson v. Nor Lock Manor Healthcare Facility,* 297 F.Supp.2d 633, 636 (W.D.N.Y. 2004) (a high number of unapproved absences and failure to follow employer's rules was found to be legitimate, non-discriminatory reason for termination); *Fitzpatrick v. N.Y. Cornell Hosp.,* No. 00 Civ. 8594, 2003 WL 102853, at *8

(S.D.N.Y. Jan. 9, 2003) (excessive absenteeism and economic downturn are legitimate reasons for termination).

The undisputed facts establish that Plaintiff was out on an unapproved absence for 32 days. SOF ¶ 32. Finally, when it was beyond clear that Plaintiff had no intention to return to work or cure her insufficient FMLA documentation, Plaintiff's employment relationship with RIH ceased. SOF ¶¶ 60, 62. Plaintiff's job abandonment is a legitimate, non-discriminatory and non-retaliatory reason for the cessation of her employment relationship with RIH. *See, e.g., Brown*, 488 F.Supp.2d at 403, 406, 410; *Egbarin,* 451 F. Supp. 2d at 423.

## VI. RIH'S ALLEGED "POLICY" REQUIRING EMPLOYEES TO SPEAK ENGLISH IN CLINICAL AREAS DOES NOT VIOLATE ANTI-DISCRIMINATION LAWS.

### A. Policies that require bi-lingual employees to speak English at work do not constitute national origin discrimination.[13]

Where, as here, an employee is bi-lingual, a rule requiring the employee speak one of the languages in which he or she is fluent in does not violate the law. *See, e.g., Garcia v. Gloor*, 618 F.2d 264, 272 (5th Cir. 1980) ("[A]n employer's rule forbidding a bilingual employee to speak anything but English in public areas while on the job is not discrimination based on national origin as applied to a person who is fully capable of speaking English and chooses not to do so in deliberate disregard of his employer's rule."); *Olivarez v. Centura Health Corp.*, 203 F. Supp. 2d

---

[13] While it does not appear that the Court of Appeals for the First Circuit has addressed the issue, it is far from clear that it would equate issues related to a person's language with national origin discrimination. *See, e.g., Garcia v. Gloor*, 618 F.2d 264, 269 (5th Cir. 1980) (the EEO Act does not support an interpretation that equates the language an employee prefers to use with his national origin); *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983) ("Language, by itself, does not identify members of a suspect class."); *Napreljac v. John Q. Hammons Hotels, Inc.*, 461 F. Supp. 2d 981, 1029-30 (S.D. Iowa 2006) ("Language and national origin are not interchangeable."); *Brewster v. City of Poughkeepsie*, 447 F. Supp. 2d 342, 351 (S.D.N.Y. 2006) ("[Title VII] does not protect against discrimination on the basis of language."); *Long v. First Union Corp.*, 894 F. Supp. 933, 941 (E.D. Va. 1995) ("nothing in Title VII . . . provides that an employee has a right to speak his or her native tongue while on the job"), *aff'd*, 86 F.3d 1151 (4th Cir. 1996); *see also Smothers v. Benitez*, 806 F. Supp. 299, 306 (D.P.R. 1992) ("While language can be considered a mutable characteristic, it has immutable aspects. New languages can be learned and old ones forgotten; however, the knowledge of a language, insofar as it is an ethnic characteristic, leaves identifiable traces like accents, surnames, and behavior patterns.").

1218, 1221-25 (D. Colo. 2002) (English-only policies as applied to bilingual employees do not, alone, violate Title VII); *Kania v. Archd. of Phil.*, 14 F. Supp. 2d 730, 733 (E.D. Pa. 1998) ("courts have agreed that – particularly as applied to multi-lingual employees – an English-only rule does not have a disparate impact on the basis of national origin, and does not violate Title VII.") (surveying cases).

In *Cosme v. Salvation Army*, 284 F. Supp. 2d 229, 239 (D. Mass. 2003), which appears to be the only decision within the First Circuit that has addressed whether English-only rules as applied to bi-lingual employees provides a basis for recovery under anti-discrimination laws, the U.S. District Court for the District of Massachusetts held that "an English Language Policy does not, in and of itself, constitute discrimination or disparate treatment for bilingual employees." *Id.* at 239 (citations omitted).

It is undisputed that Plaintiff – who took her deposition in English and worked with a population at RIH that was predominately English speaking – spoke English fluently. SOF ¶ 2. Thus, RIH's alleged policy requiring individuals, including Plaintiff, to speak English in certain areas at work when such individuals are fully capable of speaking the language is not discrimination based on national origin. *See Garcia*, 618 F.2d at 272.

**B.** **RIH's alleged policy that employees speak English in clinical areas does not violate the EEOC guidelines.**[14]

RIH's alleged policy that its employees speak English in clinical areas does not violate even the broadest interpretation of a national origin claim, which is encompassed in the EEOC guidelines. The EEOC guidelines provide that "an employer may have a rule requiring that employees speak only in English at ***certain times*** where the employer can show that the rule is justified by business necessity." 29 C.F.R § 1606.7(b) (emphasis added). Courts have routinely found that "certain times" English-only rules are permissible "when they are justified by a need to stem hostility between bilingual employees speaking a foreign language and employees who do not speak that language, as well as when English-speaking supervisors need to understand what is being said in a work area." *EEOC v. Sephora USA*, 419 F. Supp. 2d 408, 415 (S.D.N.Y. 2005) (surveying cases); *Barber v. Lovelace Sandia Health Sys.*, 409 F. Supp. 2d 1313, 1328 (D.N.M. 2005) ("There is nothing inherently discriminatory about English-only policies established for legitimate business reasons.). This is especially true, where, as here, such policy is based on a legitimate business justification. *See Roman v. Cornell Univ.*, 53 F. Supp. 2d 223, 237 (N.D.N.Y. 1999) ("All decisions of which this Court is aware have held that English-only rules are not discriminatory as applied to bilingual employees where there is a legitimate business justification for implementing such a rule" and "[s]everal courts have held that an English-only policy designed to reduce intra-office tensions is a legitimate business reason.");

---

[14] For the purposes of this motion, Defendants do not dispute the validity of the EEOC's guidance on this issue. However, the Court is not bound by the EEOC's regulations. *See Cosme v. Salvation Army*, 284 F. Supp. 2d 229, 240 (D. Mass. 2003) ("While the EEOC regulations may offer guidance to the Court, the Court is not bound by them."). *See also Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) ("As an administrative interpretation of the Act by the enforcing agency, these Guidelines, while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts . . . ***may*** properly resort for guidance.") (emphasis added, internal quotations and citations omitted); *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1489 (9th Cir. 1993) (invalidating EEOC guideline that allowed employee to establish a *prima facie* disparate impact case by merely proving existence of English-only policy; nothing in plain language of Title VII supported the guideline, and guideline contravened Supreme Court precedent by presuming, without requiring proof, that the policy had a disparate impact). Accordingly, Defendants reserve the right to dispute the validity of this regulation at a later time.

*Smothers v. Benitez*, 806 F. Supp. 299, 308 (D.P.R. 1992) ("While a blanket English-only rule is considered by the EEOC to be a per se violation of Title VII, a limited English-only rule may be justified by business necessity."); *Gonzalez v. Salvation Army*, No. 89-1679–CIV–T-17, 1991 U.S. Dist. LEXIS 21692, at *7-8 (M.D. Fla. June 3, 1991) ("The enforcement of an English-only rule on an employer's premises under circumstances where co-employees who are working or customers who visit the employer's establishment for business purposes can overhear conversations is not a violation of Title VII . . . as applied to a person . . . who has the ability to speak English."), *aff'd*, 985 F.2d 578 (11th Cir. 1992), *cert. denied*, 508 U.S. 910 (1993); *Tran v. Standard Motor Prods., Inc.*, 10 F. Supp. 2d 1199, 1210 (D. Kan. 1998) (business necessity includes insuring that all workers can understand each other, preventing injuries, and preventing co-workers from feeling they are being talked about).

The only "English-only" policy Plaintiff has identified is ***her own*** November 21, 2012, email, which stated:

> During our meeting today 11/21/12, a discussion was raised about the use of a 2nd language on the floor. Please be cognizant of using other languages on the unit and around other staff, this may be perceived as been [*sic*] rude or disrespective [*sic*]. Thank you for your cooperation in regards to this matter.

SOF ¶¶ 12, 13. As made clear by the above language, ***Plaintiff*** requested that employees be cognizant of using other languages "on the unit and around other staff." *Id.* Thus, even assuming this email constitutes an "English-only policy," it is limited to certain times. In addition, the legitimate business justification for not speaking Nigerian in front of patients is "[b]ecause it's a medical unit" and "[t]hey don't understand it[.]" SOF ¶ 18. Furthermore, as courts have made clear, ensuring that all workers understand each other and that no one feels that they are being talked about is a business necessity that constitutes a legitimate justification for the policy. *See Tran*, 10 F. Supp. 2d at 1210. Therefore, RIH's "policy" requesting that

employees speak English in clinical areas (after receiving a complaint from a staff member about the issue) does not amount to discrimination.

## VII. PLAINTIFF'S RETALIATION CLAIM FAILS AS A MATTER OF LAW.[15]

Assuming, *arguendo*, this Court finds that Plaintiff suffered an adverse action, her retaliation claim nonetheless fails as Plaintiff cannot establish a causal connection between any alleged protected activity and an adverse employment action. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2534 (2013) (holding a plaintiff in a retaliation case must prove that "his or her protected activity was a but-for cause of the alleged adverse action by the employer."); *Ponte v. Steelcase, Inc.*, 741 F.3d 310, 321 (1st Cir. 2014); *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 161 (1st Cir. 1998) (to establish a *prima facie* case of retaliation, the plaintiff must show a causal connection between the protected activity and adverse action). Any causal chain that ***could*** be formed between Plaintiff's alleged protected activity—allegedly complaining about Potter at some point in 2013 and allegedly complaining about Salhany after she was placed on the CAP—and any adverse action was severed when Plaintiff remained on an unapproved leave of absence for more than 30 days. Such a break in the causal chain negates the causation necessary for a retaliation claim. *See, e.g., Weiler v. R&T Mech., Inc.*, 255 Fed. Appx. 665, 668 (3d Cir. 2007) (finding that the plaintiff's job abandonment was a "crucial intervening fact [that] broke the causal chain" between the protected conduct and plaintiff's termination);

---

[15] RIH maintains that Plaintiff's unapproved leave does not qualify as a protected activity because, as discussed in Section II, *supra*, Plaintiff did not qualify for FMLA leave. In as much as this Court finds that Plaintiff engaged in protected activity when she complained of Salhany to Barbara Reilly and MacNeil, RIH notes, however, that Plaintiff only complained of Salhany ***after*** she was placed on a Corrective Action Plan, thereby challenging the veracity of her claim. Furthermore, any suggestion of retaliation is belied by the fact that Salhany, the supervisor about which she complained, did not participate in cessation of Plaintiff's employment with RIH. SOF ¶ 61. Moreover, there is no temporal proximity between Plaintiff's protected activity in July 2013 and the termination of her employment, which occurred in November 2013. *See, e.g., Ahern v. Shinseki*, 629 F.3d 49, 58 (1st Cir. 2010) (gap of several months does not infer causal connection between a complaint adverse action); *King v. Hanover*, 116 F.3d 965, 968 (1st Cir. 1997) (no causal connection where plaintiff disciplined five months after protected activity); *Ramirez Rodriguez v. Boehringer Ingelheim Pharms., Inc.*, 425 F. 3d 67, 85 (1st Cir. 2005) (two months between protected activity and adverse action insufficient to establish causation).

*Hankins v. AirTran Airways, Inc.*, 237 Fed. Appx. 513, 520-21 (11th Cir. 2007) (finding no causal link between the protected activity and plaintiff's termination where she committed an intervening act of misconduct which "broke the causal chain"); *Gubitosi v. Kapica*, 154 F.3d 30, 33 (2d Cir. 1998) (finding no causal connection because "it is simply impossible to miss the significant intervening events between these two dates," including plaintiff's insubordination and false written statement to her employer); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1147 (7th Cir. 1997) (finding no causal connection where the discharge followed a "significant and costly error"); *see also Furtado v. Std. Parking Corp.*, 820 F. Supp. 2d 261, 273 (D. Mass. 2011) (The "dispute is ultimately immaterial, however, because the undisputed intervening acts of misconduct sever the causal connection (if any) between the protected conduct and the adverse employment decision.") (citation omitted). The sequence of events – Plaintiff's employment relationship ceasing only after she refused to either provide complete, sufficient documentation qualifying her for FMLA leave, or return to work – leads to only one conclusion: RIH refused to maintain her employment after she was out on an 32 day unapproved absence.[16]

---

[16] Count V of Plaintiff's Complaint, alleging violations of the Rhode Island Whistleblowers Protection Act ("RIWPA"), similarly fails as a matter of law. Although the Rhode Island Supreme Court has not expressly addressed the causation test applicable to RIWPA claims, courts analyzing such claims, as well as those brought pursuant to similar statutes from other jurisdictions, have employed the framework established by the Supreme Court of the United States in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Barboza v. Town of Tiverton*, No. 07-339-ML, 2010 WL 2231995, at *7 (D.R.I. 2010); *Babbitt*, 2009 WL 3450959, at *6; *see also Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (evaluating claim under Maine Whistleblower Protection Act); *Woodford v. CVS Pharm., Inc.*, 905 F. Supp. 2d 418, 420 (D.R.I. 2012) (analyzing claim under Florida's whistleblower statute). Because the analysis for a RIWPA claim mirrors that of a retaliation claim under Title VII, FEPA, and RICRA, Plaintiff's RIWPA claim should be dismissed for the same reasons stated above.

## VIII. PLAINTIFF IS NOT PERMITTED TO RECOVER UNDER HER CLAIMS OF NEGLIGENT TRAINING AND NEGLIGENT SUPERVISION[17]

Plaintiff's negligent training and supervision claim should be dismissed for the following reasons: (1) only a third-party (as opposed to an employer's employee) is permitted to assert such a claim; (2) Rhode Island's Workers' Compensation Exclusivity Provision precludes an employee from asserting such negligence claims against his or her employer; and (3) Plaintiff cannot establish the elements of the claim, even if the Court allowed her to pursue the claim.

### A. Claims of negligent training and supervision only provide remedies for and are therefore limited to third parties.

When the Rhode Island Supreme Court adopted the principles of negligent training and negligent supervision, it unequivocally limited an employer's liability to third parties:

> [W]e align ourselves with the majority of jurisdictions that recognize the direct liability of an employer to **third parties** who are injured by acts of unfit, incompetent, or unsuitable employees.

*Welsh Mfg. v. Pinkerton's Inc.*, 474 A.2d 436, 438 (R.I. 1984) (emphasis added). "Indeed, an action for negligent hiring provides a remedy to injured **third parties** who would otherwise be foreclosed from recovery under the master-servant doctrine since the wrongful acts of employees in these cases are likely to be outside the scope of employment or not in furtherance of the master's business." *Id.* at 439 (emphasis added). While Rhode Island courts have not directly addressed the issue of whether an employee is a third-party relative to its employer, two decisions from the Rhode Island Supreme Court indicate that it would conclude that employees are not considered third-parties vis-à-vis their employers. *See Boucher v. McGovern*, 639 A.2d 1369, 1374 (R.I. 1994) (declining to allow an employee to seek contribution from a co-worker as a joint tortfeasor because Rhode Island law "deems a master and a servant or a principal and an

---

[17] The torts of "negligent training" and "negligent supervision" are separate causes of action. *See Welsh Mfg. v. Pinkerton's, Inc.,* 474 A.2d 436, 442-443 (R.I. 1984). For the purpose of this motion, Defendants believe both claims fail for the same reasons.

agent to be a single tortfeasor"); *Nunes v. Aiello*, 664 A.2d 1121, 1121-22 (R.I. 1995) (refusing to allow an employee to circumvent the workers' compensation laws to sue co-workers because plaintiff's theory of "dual liability" was "without merit").

As an employee who, unlike injured third-parties, is able to recover against RIH under a myriad of statutes, such as those under which she has asserted claims in the Complaint, Plaintiff is prohibited from seeking recovery under a claim of negligent training or supervision.

**B.    Plaintiff's negligent training and supervision claim is barred by Rhode Island's Workers' Compensation exclusivity provision.**

Rhode Island's Workers' Compensation Act ("RIWCA") provides the sole avenue of redress for employees who have suffered harm in the workplace.  *See, e.g., Nassa v. Hook-SuperRx, Inc.*, 790 A.2d 368, 373-74 (R.I. 2002) (the RIWCA is the exclusive remedy for claims against employers by employees for intentional infliction of emotional distress).  In order to accomplish this goal, the Rhode Island General Assembly included an exclusivity provision within the RIWCA, thereby barring an employee from recovery when he is entitled to recovery under the RIWCA.  *See* R.I.G.L. § 28-29-20.  "[T]he exclusivity clause is 'intended to preclude any common-law action against an employer, substituting a statutory remedy at the election of the employee when he enters employment.'"  *Folan v. State of R.I./DCYF*, 723 A.2d 287, 290 (R.I. 1999) (quoting *Hornsby v. Southland Corp.*, 487 A.2d 1069, 1072 (R.I. 1985)); *see also Nunes*, 664 A.2d at 1121-22 ("By virtue of [the exclusivity provision] an injured employee may not maintain a common law action against an employer for his or her injuries.").

Numerous courts have held that an employee may not pursue such a claim because of the workers' compensation laws.  *See, e.g., Pickett v. Colonel of Specrfish*, 209 F. Supp. 2d 999, 1004-05 (D.S.D. 2001) (claims of negligent supervision are "just one more industrial mishap in the factory, of the sort [the employer] has the right to consider exclusively covered by the

compensation system" and therefore fall "under the auspices of the Workers' Compensation statutes"); *Beaulieu v. Northrop Grumman Corp.*, 161 F. Supp. 2d 1135, 1148 (D. Haw. 2000) (negligent supervision and retention claims are work injuries arising from the conditions of plaintiff's employment and, therefore, barred by the workers' compensation exclusivity provision); *Silvestre v. Bell Atl. Corp.*, 973 F. Supp. 475, 486 (D.N.J. 1997) ("An employee cannot, however, assert negligent training and supervision against an employer. Under New Jersey law an action in negligence against an employer is barred by the New Jersey Workers Compensation Act."); *Irvin Investors, Inc. v. Sup. Ct.*, 800 P.2d 979, 982 (Ariz. Ct. App. 1990) (workers' compensation statute barred plaintiff's claims of negligent hiring, supervision and retention); *Downer v. Detroit Receiving Hosp.*, 477 N.W.2d 146, 148 (Mich. Ct. App. 1991) ("we find that plaintiff's [negligent hiring] claim is barred by the exclusive remedy provision of the Workers' Disability Compensation Act."); *Fields v. Cummins Emps. Fed. Credit Union*, 540 N.E.2d 631, 636 (Ind. Ct. App. 1989) (the plaintiff's "claim for negligent retention was premised on [her employer's] negligence in the employment relationship . . . such claims are barred by the exclusivity provision of the Worker's Compensation Act.").

Plaintiff claims that RIH was negligent in training and supervising its agents, supervisors, and managers. Plaintiff's claims clearly arise out of and directly deal with her employment. The RIWCA provides the exclusive remedy for work-related personal injuries, like the ones alleged by Plaintiff. *See Nassa*, 790 A.2d at 372. Accordingly, Plaintiff's negligent training and supervision claim should be dismissed because it is bared by the RIWCA's exclusivity provision.

### C. Plaintiff has failed to establish the elements of negligent training and supervision.

Assuming, *arguendo*, that Plaintiff's negligent training and supervision claim is not limited to third-parties or barred by the RIWCA's exclusivity provision, Plaintiff is ***still*** unable to

establish the requisite elements of the claim. In order to establish a claim for negligent training or supervision, a plaintiff must show that the employer failed "to exercise reasonable care in [training or supervising] a person who the employer knew or should have known was unfit or incompetent for the employment, thereby exposing third parties to an unreasonable risk of harm." *Welsh Mfg.*, 474 A.2d at 440. Plaintiff has failed to produce a single fact from which the Court could conclude that the Hospital failed to exercise reasonable care in training or supervising Salhany or any other employees.

## CONCLUSION

Plaintiff's employment relationship ceased with RIH because, after being out on an unapproved leave of absence, Plaintiff neither provided sufficient medical documentation entitling her to FMLA leave nor returned to work. As a result, and pursuant to its numerous letters indicating exactly that, RIH could no longer maintain Plaintiff's employment. This was completely reasonable, especially given that Plaintiff previously submitted sufficient paperwork in order to take an approved leave of absence in 2012. In light of the complete absence of any evidence which even *arguably* suggests Defendants' actions were related to any improper motive, Plaintiff's claims must be dismissed.

RHODE ISLAND HOSPITAL and
LIFESPAN CORPORATION,

By their attorneys,

/s/ Eric B. Mack
John D. Doran (#6415)
Eric B. Mack (#7784)
LITTLER MENDELSON, P.C.
One Financial Plaza, Suite 2205
Providence, RI  02903
T: 401.824.2500
F: 401.454.2969
jdoran@littler.com
Dated: December 20, 2017                    emack@littler.com

## CERTIFICATE OF SERVICE

I, Eric B. Mack, certify that a true and accurate copy of the foregoing was filed and

served electronically by operation of the Court's CM/ECF System upon all counsel of record on

this 20th day of December, 2017.

/s/ Eric B. Mack
Eric B. Mack

Firmwide:151841673.5 057807.1078